1 | LIBERTY JUSTICE CENTER
Emily Rae (State Bar No. 308010)
2 | erae@ljc.org
13341 W. U.S. Highway 290
3 | Building 2
4 | Austin, Texas 78737

5

6 |                IN THE UNITED STATES DISTRICT COURT
7 |            FOR THE EASTERN DISTRICT OF CALIFORNIA

8 | CHINO VALLEY UNIFIED SCHOOL
DISTRICT, a local educational agency; OSCAR      Case No. _____
9 | AVILA, an individual; MONICA BOTTS, an          Temporary Case No. 2:24-at-893
individual; JASON CRAIG, an individual; KRISTI
10 | HAYS, an individual; COLE MANN, an
individual; VICTOR ROMERO, an individual;        **COMPLAINT FOR DECLARATORY AND**
11 | GHEORGHE ROSCA, JR., an individual; and        **INJUNCTIVE RELIEF**
LESLIE SAWYER, an individual;
12

13 |                   Plaintiffs,
14 | v.

15 | GAVIN NEWSOM, in his official capacity as
Governor of the State of California; ROBERT
16 | BONTA, in his official capacity as Attorney
General of the State of California; and TONY
17 | THURMOND, in his official capacity as California
State Superintendent of Public Instruction;
18
19 |                   Defendants.

20

21 |        1.      Numerous studies assert that transgender and gender nonconforming students suffer from

22 | increased psychological, emotional, and physical harassment and abuse, and that transgender youth

23 | experience an abnormally high number of suicidal thoughts and make an abnormally high number of

24 | suicide attempts.

25 |        2.      Faced with these concerns, various California school districts have adopted policies under

26 | which the school respects the wishes of students who ask to be treated as a gender different from their natal

27 | sex, while also making parents aware that the school is participating in the social transition of their child.

28

1  These policies ensure that school districts do not betray the extraordinary trust placed in them by parents,

2  who otherwise would be misled about a monumental change to the development of their child and to that

3  child's official and unofficial school records.

4        3.      These parental notification policies often address not only gender transition but also myriad

5  other issues that parents would want or need to know about their child's education and development.

6        4.      For example, if a student is injured, bullied, or exhibits suicidal behavior at school, but does

7  not want their parents to know, a school will notify the parents. If a student breaks their arm, hits their

8  head, or develops a fever, the school will immediately tell the student's parents. If a student is bullied or

9  involved in a verbal or physical fight, the school will tell the parents. If a student expresses a desire to hurt

10  or kill themself, the school will tell the parents. So, too, must a school tell parents if a student has asked

11  the school to participate in that student's gender transition.

12        5.      But through Assembly Bill 1955 ("AB 1955") California now seeks to bar schools from

13  adopting policies that would require notifying parents when their children may be at increased risk of

14  psychological, emotional, and physical harassment and abuse, and extremely high rates of suicide and

15  suicide attempts. Specifically, AB 1955 states that a "school district . . . shall not enact or enforce any

16  policy, rule, or administrative regulation that would require an employee or a contractor to disclose any

17  information related to a pupil's . . . gender identity[] or gender expression to *any other person* without the

18  pupil's consent . . ." (emphasis added). This means that, no matter how young a child is, a school cannot

19  tell the child's parents the school is socially transitioning their child without the minor's "consent."

20        6.      This action is brought on behalf of Chino Valley Unified School District and certain

21  California parents of children in the public school system who seek to bar California from implementing

22  AB 1955 in violation of their First and Fourteenth Amendment rights and the Family Educational Rights

23  and Privacy Act ("FERPA").

**JURISDICTION AND VENUE**

25        7.      This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of

26  Plaintiffs' constitutional right to free exercise of religion under the First Amendment to the U.S.

27  Constitution and right to parent under the Fourteenth Amendment to the U.S. Constitution. Accordingly,

28  this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

8.     This Court has the authority to award the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202; the requested injunctive relief under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

9.     The Eastern District of California is the appropriate venue for this action under 28 U.S.C. § 1391 because it is the judicial district in which Defendant Newsom resides and the district in which a substantial part of the events or omissions giving rise to the claim occurred, and all Defendants reside in California.

## PARTIES

*District Plaintiff*

10.     Plaintiff Chino Valley Unified School District ("CVUSD") is a public entity established and organized under California law and subject to the restrictions of the United States Constitution. CVUSD is a public school district and local educational agency as defined by California Education Code section 56026.3. CVUSD's responsibilities include crafting and implementing policies for the district's employees and students within its jurisdiction.

*Parent Plaintiffs*

11.     Plaintiff Oscar Avila is and at all relevant times has been a resident of the State of California. He is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of I.A., a rising eleventh-grade student attending public school in the Chino Valley Unified School District.

12.     Plaintiff Monica Botts is and at all relevant times has been a resident of the State of California. She is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of A.B., a rising tenth-grade student attending public school in the Temecula Valley Unified School District.

13.     Plaintiff Jason Craig is and at all relevant times has been a resident of the State of California. He is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of L.C., a rising kindergarten student, and M.C., a rising first-grade student, both attending public school in the Temecula Valley Unified School District.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

14.     Plaintiff Kristi Hays is and at all relevant times has been a resident of the State of California. She is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of T.H., a rising fifth-grade student, and T.H., a rising seventh-grade student, both attending public school in the Chino Valley Unified School District.

15.     Plaintiff Cole Mann is and at all relevant times has been a resident of the State of California. She is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of M.M., a rising third-grade student, and S.M., a rising fourth-grade student, both attending public school in the Temecula Valley Unified School District

16.     Plaintiff Victor Romero is and at all relevant times has been a resident of the State of California. He is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of H.R., a rising preschool student, and G.N., a rising twelfth-grade student, both attending public school in the Chino Valley Unified School District.

17.     Plaintiff Gheorghe Rosca, Jr. is and at all relevant times has been a resident of the State of California. He is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of C.R., a rising tenth-grade student attending public school in the Orange Unified School District.

18.     Plaintiff Leslie Sawyer is and at all relevant times has been a resident of the State of California. She is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of J.S., a rising preschool student, J.S., a rising fifth-grade student, and J.S., a rising ninth-grade student, all attending public school in the Pacheco Union School District and Anderson Union High School District.

19.     Each of the Parent Plaintiffs objects on both conscience and religious grounds to their public schools withholding information about changes to their child's gender identity from them and seek declaratory and injunctive relief preventing AB 1955 from being enforced against their child or children.

***Defendants***

20.     Defendant Gavin Newsom is the Governor of California. The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. art. V, § 1. Defendant Newsom is sued in his official capacity.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

21.     Defendant Robert Bonta is the Attorney General of California. The California Constitution vests the Attorney General with the duty "to see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. V, § 3. Defendant Bonta is sued in his official capacity.

22.     Defendant Tony Thurmond is the California State Superintendent of Public Instruction. Defendant Thurmond is the California Department of Education ("CDE")'s main executive officer responsible for creating, adopting, and implementing CDE policies and guidance documents. Defendant Thurmond is sued in his official capacity.

## FACTUAL ALLEGATIONS

### AB 1955

23.     On July 15, 2024, Defendant Governor Newsom signed AB 1955 into law. Absent judicial intervention, AB 1955 will take effect January 1, 2025.

24.     AB 1955 makes several changes to the California Education Code regarding the treatment of children who request to "socially transition" their gender at school, which refers primarily to adopting a new name and/or pronouns that differ from one's natal sex.

25.     AB 1955 provides in relevant part that "[a]n employee or a contractor of a school district . . . shall not be required to disclose any information related to a pupil's . . . gender identity[] or gender expression to any other person without the pupil's consent." Cal. Ed. Code § 220.3.

26.     AB 1955 also prohibits all California school districts from "enact[ing] or enforc[ing] any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's . . . gender identity[] or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law." Cal. Ed. Code § 220.5(a).

27.     AB 1955 further provides that "[a]ny policy, regulation, guidance, directive, or other action of a school district . . . that is inconsistent with" the previous section "is invalid and shall not have any force or effect." *Id.* § 220.5(c).

28.     Taken together, these provisions upend the traditional relationship between students, their parents, and their teachers.

29.     Notably, AB 1955 includes within its scope all students in California school districts—including students in preschool, kindergarten, elementary school, middle school, and high school. This

5

1    means that if a four-year-old student requested to change their gender at school, their parents might not be

2    notified without that four-year-old's consent.

3         30.    Notifying parents of significant events that impact their children at school—such as when

4    they are injured, bullied, or express a desire to self-harm—is, of course, the norm. But AB 1955 carves out

5    special exceptions for school policies that have the effect of notifying parents if their child asks their school

6    to facilitate the child's social transition due to changes in their gender identity.

7    ***Socially Transitioning Children Without Parental Involvement Negatively Impacts Children***

8         31.    A social transition can include more than just name and pronoun changes—individuals

9    adopting a transgender identity sometimes change their hairstyle, clothing, or their appearance in other

10   ways; begin using opposite-sex facilities; and make other social changes. In medical and psychological

11   literature, however, the phrase "social transition" is primarily used to refer to name and pronoun changes.

12   "Social transition" is distinct from medical transition, which refers to various medical interventions to

13   bring one's physical appearance into closer alignment with one's asserted gender identity, such as puberty

14   blockers, cross-sex hormone therapy, and various surgical interventions. The primary therapeutic purpose

15   of social transitioning is to relieve the psychological distress associated with having a mismatch between

16   one's natal sex and gender identity.

17        32.    The World Professional Association for Transgender Health ("WPATH") is a scientific,

18   professional, and educational organization that, among other things, produces a set of recommendations

19   for transgender health care. Its "Standards of Care" document ("SOC") is one of the more widely known

20   and cited set of guidelines for transgender care, though its recommendations are not universally agreed

21   upon by professionals in the field.

22        33.    Aside from a few limited exceptions, medical and mental-health providers generally cannot

23   see or treat a minor without informed consent from the parent(s)/legal guardian(s), both as a matter of state

24   laws and as a matter of medical ethics. *Standards of Care for the Health of Transgender and Gender*

25   *Diverse People, Version 8*, WPATH, International J. Trans. Health 2022, Vol. 23, No. S1, S1–S258 (2022),

26   *available at* https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("WPATH SOC8")

27   at S61 ("In most settings, for minors, the legal guardian is integral to the informed consent process: if a

28

1    treatment is to be given, the legal guardian (often the parent[s]/caregiver[s]) provides the informed consent

2    to do so.").

3        34.    This is because children and adolescents lack the "skills for future thinking, planning, big

4    picture thinking, and self-reflection" that are necessary for informed decision-making. *Id.* at S62.

5        35.    Minors' decisions are often influenced by factors that are unrelated to their long-term best

6    interests, such as "a sense of urgency that stems from hypersensitivity to reward," a "heightened focus on

7    peer relationships," and "increased risk-taking behaviors." *Id.* at S44. In light of the ongoing and unfinished

8    development of emotional and cognitive maturity during childhood and adolescence, "[i]n most settings,

9    for minors, the legal guardian is integral to the informed consent process." *Id.* at S61.

10       36.    Parental involvement is also necessary as a practical matter. Many children and adolescents

11   could not get to any appointments with a mental-health provider without their parents' assistance. And

12   most children and adolescents do not have their own health insurance and would have no way to pay for

13   those appointments.

14       37.    Parental involvement is also important for accurate diagnosis, as parents often have a critical

15   perspective on the history and likely causes of a child's or adolescent's gender questioning feelings. Parents

16   are often the only people who have frequently and regularly interacted with a child or adolescent

17   throughout the child's or adolescent's entire life, and therefore they have a unique view of the child's

18   development over time. Indeed, parents often have more knowledge than even the child or adolescent does

19   of whether their child or adolescent exhibited any signs of gender incongruence or gender dysphoria during

20   the earliest years of life.

21       38.    Thus, parental involvement is a critical part of the diagnostic process to evaluate how long

22   the child or adolescent has been experiencing gender incongruence, whether there might be any external

23   cause of those feelings, and a prediction of how likely those feelings are to persist.

24       39.    WPATH, for example, notes that "parent(s)/caregiver(s) may provide key information for

25   the clinical team, such as the young person's gender and overall developmental, medical, and mental health

26   history as well as insights into the young person's level of current support, general functioning, and well-

27   being." *Id.* at S58.

28

40.     And, as WPATH notes, "a parent/caregiver report may provide critical context in situations in which a young person experiences very recent or sudden self-awareness of gender diversity and a corresponding gender treatment request, or when there is concern for possible excessive peer and social media influence on a young person's current self-gender concept." *Id.* Thus, the reconstructed history from a child or adolescent often does not match the reported history from the parent. Likewise, children and adolescents often acknowledge that they have consumed many hours of social media from other transgender youth and have absorbed these experiences in some personal way.

41.     Indeed, WPATH's SOC8 recommends "involving parent(s) or primary caregiver(s) in the assessment process . . . in almost all situations," and adds that "including parent(s)/caregiver(s) in the assessment process to encourage and facilitate increased parental understanding and support of the adolescent may be one of the most helpful practices available." *Id.* This is why it is critical that healthcare providers, parents, and the child work together and come to consensus about the truth about each individual child. This requires healthcare providers to meet with the parent(s) before seeing a child or adolescent, to get their perspective on when, where, and how their child's feelings began, and continue to meet with parents throughout the assessment process as well, as necessary.

42.     Given the need for informed consent, as explained above, parental involvement is a necessary prerequisite for any kind of treatment by a medical professional. For example, a child experiencing depression/anxiety related to gender incongruence ordinarily could not receive counseling or medication to treat the depression/anxiety without the informed consent of a parent/guardian.

43.     Parents should also be involved to make important decisions about next steps for their minor child or adolescent, especially given the somewhat complicated risk-benefit calculus in this context and the limited knowledge about long-term effects and outcomes.

44.     WPATH recommends that mental health providers "should provide guidance *to parents/caregivers* and supports to a child when a social gender transition is being considered" and to "facilitate the parents/caregivers' success in making informed decisions about the advisability and/or parameters of a social transition for their child." *Id.* at S78.

45.     Thus, a school-facilitated transition without parental knowledge and buy-in interferes with the parents' ability to pursue a careful, investigative assessment before undergoing a gender identity

8

transition. If a school facilitates a social transition at school without parental knowledge and buy-in, it necessarily interferes with the parents' ability to take a cautious approach and pursue an evaluation and assessment before allowing their child or adolescent to make significant changes to their identity. A school-facilitated transition without parental knowledge also interferes with parents' ability to pursue a treatment approach that does not involve an immediate transition—such as an exploratory process to understand the cause of the feelings or self-perceptions of gender incongruence.

46.     A school-facilitated transition over the objection of parents (or, possibly worse, without their knowledge) necessarily creates tension in the parent-child relationship. A common principle in the training for psychotherapists who work with children and adolescents is to never create or aggravate any tensions in the parent-child relationship. By facilitating a social transition at school over the parents' objection or without their knowledge, a school would drive a wedge between the parent and child.

47.     Similarly, facilitating a double life for some children, in which they present as transgender in some contexts but not in other contexts, is not in their best interest.

48.     WPATH recognizes that "social transition for children typically can only take place with the support and acceptance of parents/caregivers." *Id.* at S77. Likewise, "adolescents are typically dependent on their caregivers/parents for guidance in numerous ways," including as they "navigate[] through the process of deciding about treatment options." *Id.* at S49.

49.     As WPATH notes elsewhere, "[p]arent and family support of TGD youth is a primary predictor of youth well-being." *Id.* at S58. Circumventing, bypassing, or excluding parents from decisions about a social transition undermines the main support structure for a child or adolescent who desperately needs support.

50.     Indeed, Plaintiffs are not aware of any professional body that has endorsed school-facilitated social transitions without parental knowledge.

51.     Thus, when a child presents with a desire to use a new name or pronouns, the very first step should be to notify parents and involve them in the process of considering whether the child should undergo a careful professional assessment by a mental health professional with expertise in child gender incongruence.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*Parental Notification Policies Are Both Constitutional and Necessary*

52.     PK-12 minor students, most of whom are too young to drive, vote, or provide medical consent for themselves, are also too young to make life-altering decisions about their expressed gender identity without their parents' knowledge.

53.     But that is precisely what AB 1955 enables, with severe consequences for children too young to fully comprehend them.

54.     A number of school districts in California had, prior to AB 1955's passage, enacted policies designed to protect students, and to protect parents' rights "to determine, without undue interference by the State, how best to raise, nurture, and educate the child." *Troxel v. Granville,* 350 U.S. 57, 67-68 (2000).

55.     For example, Plaintiff CVUSD's Board Policy 5010 provides in part that parents be notified "in writing, within three days from the date any District employee, administrator, or certified staff, becomes aware that a student is requesting to change any information contained in the student's official or unofficial records." To the extent that a child requests that their school facilitate socially transitioning the student by, for example, changing their preferred name or pronouns that are reflected on official or unofficial records, Board Policy 5010 requires that parents be notified of that change to their child's records.

56.     CVUSD is hardly alone. *See, e.g.*, Anderson Union High School District Board Policy 5010.11; Murietta Valley Unified School District Board Policy 5020; Orange County Board of Education Policy 600-2; Orange Unified School District Board Policy 5020; Rocklin Unified School District Board Policy 5020; Temecula Valley Unified School District Board Policy 5020.

57.     Social transition is an impactful psychotherapeutic intervention. It may or may not be the best therapeutic approach for any specific child. Parents must be notified and involved in the process to determine whether social transition is appropriate. CVUSD's Board Policy 5010, for example, facilitates this process when a child's request to social transition requires changes to the student's official or unofficial school records. Any contrary policies that may require immediate social transition of children who request it may increase persistence among children who may have desisted had they received evaluation by a competent mental health professional. Persistence for such children is not in their best long-term interest.

58.     Parental notification policies like those adopted by CVUSD and other school districts are consistent with best practices relating to parental notification when a child or adolescent expresses a desire

to be socially transitioned at school insofar as they encourage and facilitate maintaining the relationship between parents and their children. Best mental health practices abhor activity that maintains secrets between children and their parents, which create distrust and tension. In all cases, parental consent is required to provide medical and psychological treatment to minors. In part, this is because the science of mental health recognizes that the best evidence regarding a minor's mental and emotional well-being comes from first-hand accounts by parents, rather than potentially biased accounts from immature children.

## CLAIMS FOR RELIEF

### First Claim for Relief:

### Violation of Substantive Due Process of the Fourteenth Amendment to the U.S. Constitution: Violation of Parental Rights

### (Parent Plaintiffs/All Defendants)

59.     The allegations contained in all preceding paragraphs are incorporated herein by reference.

60.     The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

61.     Parents have a constitutional right "to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57 (2000). This includes the right to direct their children's upbringing and education. *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 269 U.S. 510 (1925); *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

62.     Parental rights are not secondary to the desires of government agencies. "Simply because the decision of a parent is not agreeable to a child, or because it involves risks, does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham v. J.R.*, 442 U.S. 584, 603 (1979).

63.     Parents also have "broad parental authority over minor children." *Id.* And there is an "assumption that minors will benefit from consultation with their parents." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 895 (1992), overruled on other grounds by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

64.     "The fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child." *Parham,* 442 U.S. at 603. And children themselves lack the "maturity, experience, and capacity for judgment required for making life's difficult decisions." *Id.* at 602.

65.     Prescribing pronouns and facilitating a social transition is making a significant decision about a child's health and welfare. Gender transition is life-altering and implicates related medical issues that require the parents' care and attention.

66.     The Parent Plaintiffs are entitled to declaratory relief; temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of AB 1955; and attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

**Second Claim for Relief:**

**Violation of Free Exercise Clause of First Amendment to U.S. Constitution:**

**Not Generally Applicable due to Comparable Exemptions**

**(Parent Plaintiffs/All Defendants)**

67.     The allegations contained in all preceding paragraphs are incorporated herein by reference.

68.     Parents have a right to control "the religious upbringing and education of their minor children," which is protected by strict scrutiny under the Free Exercise Clause. *Wisconsin v. Yoder,* 406 U.S. 205, 231 (1972); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020).

69.     The Parent Plaintiffs have each alleged that they are devout Christians who believe God created man and woman as distinct, immutable genders; their religious beliefs require that they be notified if their child requests to socially transition at school so that they may be involved with their child's treatment at school.

70.     AB 1955 prevents school districts from adopting parental notification policies and protects teachers and other school employees who choose to violate the Parent Plaintiffs' rights secured by the Free Exercise Clause by willfully withholding critical information from parents concerning changes to their child's gender identity or gender expression.

71.     Compelling the Parent Plaintiffs to allow their child's school to socially transition their child to a new gender without their knowledge or involvement violates Parent Plaintiffs' rights to direct the upbringing of their children in accordance with their religious beliefs.

72.     The Parent Plaintiffs are entitled to declaratory relief; temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of AB 1955; and attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

**Third Claim for Relief:**

**The Family Educational Rights and Privacy Act preempts AB 1955's ban on informing parents of their child's gender identity.**

**(All Plaintiffs/All Defendants)**

73.     The allegations contained in all preceding paragraphs are incorporated herein by reference.

74.     The Family Educational Rights and Privacy Act governs communications between a school and the parents of a student regarding that student's education and education records. 20 U.S.C. § 1232g.

75.     FERPA defines "education records" as documents that "contain information directly related to a student" and "are maintained by an educational agency or institution." 20 U.S.C. § 1232g(a)(4)(A).

76.     Schools that receive federal funds must guarantee parent access to student education records and the ability to contest and correct errors within those records. 20 U.S.C. § 1232g(a)(2); *Owasso Indept. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 435 (2002).

77.     Any record created by a school pertaining to a child's gender "transition" would necessarily be a record that "contain[s] information directly related to a student" and is "maintained by an educational agency" and therefore fall within the coverage of FERPA.

78.     As such, those records must be accessible to parents.

79.     To the extent a child requests to socially transition at school by changing their name or pronouns, and to that extent that information must be reflected in school records in accordance with FERPA, AB 1955 therefore compels Plaintiff CVUSD employees to violate FERPA and deprives the Parent Plaintiffs of their rights under FERPA.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

80.     Plaintiffs are entitled to declaratory relief; temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of AB 1955; and attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

**Fourth Claim for Relief:**

**Declaratory (under 28 U.S.C. § 2201(a)) and Injunctive Relief**
**On the Basis of Federal Constitutional Preemption**

**(Plaintiff Chino Valley Unified School District/All Defendants)**

81.     The allegations contained in all preceding paragraphs are incorporated herein by reference.

82.     AB 1955 compels Plaintiff CVUSD to violate the Parent Plaintiffs' parental rights.

83.     As government agencies and employees thereof, Plaintiff CVUSD must comply with the U.S. Constitution or risk monetary liability.

84.     Plaintiff CVUSD asserts that AB 1955 is preempted by federal constitutional law and impermissibly interferes with parental rights. *See Cal. Rest. Ass'n v. City of Berkeley*, 547 F. Supp. 3d 878, 888 (N.D. Cal. 2021), *jurisd. aff'd, merits rev'd*, 89 F.4th 1094 (9th Cir. 2024) (cleaned up) ("[W]hen a plaintiff seeks to enjoin state action because federal law preempts it, jurisdiction is proper.").

85.     Plaintiff CVUSD seeks a determination that the First and Fourteenth Amendments precludes the government—namely, public school teachers and other employees—from withholding information from parents regarding changes to their child's gender identity or expression.

86.     There is no plain, speedy, and adequate remedy at law to protect Plaintiff CVUSD's rights. Therefore, Plaintiff CVUSD seeks a declaration from this Court that AB 1955 violates the U.S. Constitution.

87.     Further, because Plaintiff CVUSD's parental notification policy (Board Policy 5010) does not discuss or even mention gender—and instead only requires parents to be notified if a student requests to change their official or unofficial school records—Plaintiff CVUSD asserts that its Board Policy 5010 falls outside of the scope of AB 1955.

88.     Plaintiff CVUSD is entitled to declaratory relief; temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of AB 1955; in the alternative, a declaration that

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  Board Policy 5010 does not violate AB 1955; and attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983

2  and 1988.

3                                                                **PRAYER FOR RELIEF**

4            WHEREFORE, Plaintiffs pray for judgment against Defendants for the following:

5        A.  An order and judgment declaring that AB 1955 violates the First and Fourteenth Amendments to

6            the U.S. Constitution and FERPA;

7        B.  An order temporarily, preliminary, and permanently enjoining and prohibiting Defendants from

8            enforcing AB 1955;

9        C.  In the alternative, an order and judgment that Plaintiff CVUSD's Board Policy 5010 does not

10           violate AB 1955;

11       D.  Attorneys' fees and costs; and

12       E.  Any other relief as this Court deems just and proper.

13                                                        Respectfully Submitted,

14

15   Dated: July 16, 2024                                LIBERTY JUSTICE CENTER

16                                            By:  *Emily Rae*  _____

17                                                 Emily Rae
                                                   Attorney for Plaintiffs
18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF