LIBERTY JUSTICE CENTER
Emily Rae (State Bar No. 308010)
erae@ljc.org
Noelle Daniel (admitted *pro hac vice*)
ndaniel@ljc.org
13341 W. U.S. Highway 290
Building 2
Austin, Texas 78737

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHINO VALLEY UNIFIED SCHOOL DISTRICT, a local educational agency; ANDERSON UNION HIGH SCHOOL DISTRICT, a local educational agency; ORANGE COUNTY BOARD OF EDUCATION, a local educational agency; OSCAR AVILA, an individual; MONICA BOTTS, an individual; JASON CRAIG, an individual; KRISTI HAYS, an individual; COLE MANN, an individual; VICTOR ROMERO, an individual; GHEORGHE ROSCA, JR., an individual; and LESLIE SAWYER, an individual;<br><br>Plaintiffs,<br><br>v.<br><br>GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROBERT BONTA, in his official capacity as Attorney General of the State of California; and TONY THURMOND, in his official capacity as California State Superintendent of Public Instruction;<br><br>Defendants. | Case No. 2:24-cv-01941-DJC-JDP<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Courtroom: 10<br>Judge: The Honorable Daniel J. Calabretta<br>Trial Date: None Set<br>Action Filed: July 16, 2024<br>FAC Filed: August 8, 2024 |

1. Numerous studies assert that transgender-identifying and gender nonconforming students suffer from increased psychological, emotional, and physical harassment and abuse, and that transgender-identifying youth experience an abnormally high number of suicidal thoughts and make an abnormally high number of suicide attempts.

2. Faced with these concerns, various California school districts have adopted policies under which the school respects the wishes of students who ask to be treated as a gender different from their natal sex, while also making parents aware that the school is participating in the social transition of their child. These policies ensure that school districts do not betray the extraordinary trust placed in them by parents, who otherwise would be misled about a monumental change to the development of their child and to that child's official and unofficial school records.

3. These parental notification policies often address not only gender transition but also myriad other issues that parents would want or need to know about their child's education and development.

4. For example, if a student is injured, bullied, or exhibits suicidal behavior at school, but does not want their parents to know, a school will notify the parents. If a student breaks their arm, hits their head, or develops a fever, the school will immediately tell the student's parents. If a student is bullied or involved in a verbal or physical fight, the school will tell the parents. If a student expresses a desire to hurt or kill themself, the school will tell the parents. So, too, must a school tell parents if a student has asked the school to participate in that student's gender transition.

5. But through Assembly Bill 1955 ("AB 1955") California now seeks to bar schools from adopting policies that would require notifying parents when their children may be at increased risk of psychological, emotional, and physical harassment and abuse, and extremely high rates of suicide and suicide attempts. Specifically, AB 1955 states that a "school district . . . shall not enact or enforce any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's . . . gender identity[] or gender expression to *any other person* without the pupil's consent . . ." (emphasis added). This means that, no matter how young a child is, a school cannot tell the child's parents the school is socially transitioning their child without the minor's "consent."

6. This action is brought on behalf of Chino Valley Unified School District, Anderson Union High School District, Orange County Board of Education, and certain California parents of children in the

2

public school system who seek to bar California from implementing AB 1955 in violation of their First and Fourteenth Amendment rights and the Family Educational Rights and Privacy Act ("FERPA").

## JURISDICTION AND VENUE

7. This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiffs' constitutional right to free exercise of religion under the First Amendment to the U.S. Constitution, right to parent under the Fourteenth Amendment to the U.S. Constitution, and rights under the Family Educational Rights and Privacy Act (20 U.S.C. § 1232g). Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343.

8. This Court has the authority to award the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202; the requested injunctive relief under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

9. The Eastern District of California is the appropriate venue for this action under 28 U.S.C. § 1391 because it is the judicial district in which Defendant Newsom resides and the district in which a substantial part of the events or omissions giving rise to the claim occurred, and all Defendants reside in California.

## PARTIES

*District Plaintiffs*

10. Plaintiff Chino Valley Unified School District ("CVUSD") is a public entity established and organized under California law and subject to the restrictions of the United States Constitution. CVUSD is a public school district and local educational agency as defined by California Education Code section 56026.3. CVUSD's responsibilities include crafting and implementing policies for the district's employees and students within its jurisdiction.

11. Plaintiff Anderson Union High School District ("AUHSD") is a public entity established and organized under California law and subject to the restrictions of the United States Constitution. AUHSD is a public school district and local educational agency as defined by California Education Code section 56026.3. AUHSD's responsibilities include crafting and implementing policies for the district's employees and students within its jurisdiction.

12. Plaintiff Orange County Board of Education ("OCBE") is a public entity established and organized under California law and subject to the restrictions of the United States Constitution. OCBE is a public school district and local educational agency as defined by California Education Code section 56026.3. OCBE's responsibilities include crafting and implementing policies for the district's employees and students within its jurisdiction.

*Parent Plaintiffs*

13. Plaintiff Oscar Avila is and at all relevant times has been a resident of the State of California. He is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of I.A., a rising eleventh-grade student attending public school in the Chino Valley Unified School District.

14. Plaintiff Monica Botts is and at all relevant times has been a resident of the State of California. She is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of A.B., a rising tenth-grade student attending public school in the Temecula Valley Unified School District.

15. Plaintiff Jason Craig is and at all relevant times has been a resident of the State of California. He is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of L.C., a rising kindergarten student, and M.C., a rising first-grade student, both attending public school in the Temecula Valley Unified School District.

16. Plaintiff Kristi Hays is and at all relevant times has been a resident of the State of California. She is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of T.H., a rising fifth-grade student, and T.H., a rising seventh-grade student, both attending public school in the Chino Valley Unified School District.

17. Plaintiff Cole Mann is and at all relevant times has been a resident of the State of California. She is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of M.M., a rising third-grade student, and S.M., a rising fourth-grade student, both attending public school in the Temecula Valley Unified School District

18. Plaintiff Victor Romero is and at all relevant times has been a resident of the State of California. He is and at all relevant times has been a devout Christian who believes God created man and

4
FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

woman as distinct, immutable genders and the parent of H.R., a rising preschool student, and G.N., a rising twelfth-grade student, both attending public school in the Chino Valley Unified School District.

19. Plaintiff Gheorghe Rosca, Jr. is and at all relevant times has been a resident of the State of California. He is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of C.R., a rising tenth-grade student attending public school in the Orange Unified School District.

20. Plaintiff Leslie Sawyer is and at all relevant times has been a resident of the State of California. She is and at all relevant times has been a devout Christian who believes God created man and woman as distinct, immutable genders and the parent of J.S., a rising preschool student, J.S., a rising fifth-grade student, and J.S., a rising ninth-grade student, all attending public school in the Pacheco Union School District and Anderson Union High School District.

21. Each of the Parent Plaintiffs objects on both conscience and religious grounds to their public schools withholding information about changes to their child's gender identity from them and seek declaratory and injunctive relief preventing AB 1955 from being enforced against their child or children.

***Defendants***

22. Defendant Gavin Newsom is the Governor of California. The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. art. V, § 1. Defendant Newsom is sued in his official capacity.

23. Defendant Robert Bonta is the Attorney General of California. The California Constitution vests the Attorney General with the duty "to see that the laws of the State are uniformly and adequately enforced." Cal. Const. art. V, § 3. Defendant Bonta is sued in his official capacity.

24. Defendant Tony Thurmond is the California State Superintendent of Public Instruction. Defendant Thurmond is the California Department of Education's ("CDE") main executive officer responsible for creating, adopting, and implementing CDE policies and guidance documents. Defendant Thurmond is sued in his official capacity.

**FACTUAL ALLEGATIONS**

***AB 1955***

25.   On July 15, 2024, Defendant Governor Newsom signed AB 1955 into law. Absent judicial intervention, AB 1955 will take effect January 1, 2025.

26.   AB 1955 makes several changes to the California Education Code regarding the treatment of children who request to "socially transition" their gender at school, which refers primarily to adopting a new name and/or pronouns that differ from one's natal sex.

27.   AB 1955 provides in relevant part that "[a]n employee or a contractor of a school district . . . shall not be required to disclose any information related to a pupil's . . . gender identity[] or gender expression to any other person without the pupil's consent." Cal. Ed. Code § 220.3.

28.   AB 1955 also prohibits all California school districts from "enact[ing] or enforc[ing] any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's . . . gender identity[] or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law." Cal. Ed. Code § 220.5(a).

29.   AB 1955 further provides that "[a]ny policy, regulation, guidance, directive, or other action of a school district . . . that is inconsistent with" the previous section "is invalid and shall not have any force or effect." *Id.* § 220.5(c).

30.   Taken together, these provisions upend the traditional relationship between students, their parents, and their teachers.

31.   Notably, AB 1955 includes within its scope all students in California school districts—including students in preschool, kindergarten, elementary school, middle school, and high school. This means that if a four-year-old student requested to change their gender at school, their parents might not be notified without that four-year-old's consent.

32.   Notifying parents of significant events that impact their children at school—such as when they are injured, bullied, or express a desire to self-harm—is, of course, the norm. But AB 1955 carves out special exceptions for school policies that have the effect of notifying parents if their child asks their school to facilitate the child's social transition due to changes in their gender identity.

6
FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*Socially Transitioning Children Without Parental Involvement Negatively Impacts Children*

33. A social transition can include more than just name and pronoun changes—individuals adopting a transgender identity sometimes change their hairstyle, clothing, or their appearance in other ways; begin using opposite-sex facilities; and make other social changes. In medical and psychological literature, however, the phrase "social transition" is primarily used to refer to name and pronoun changes. "Social transition" is distinct from medical transition, which refers to various medical interventions to bring one's physical appearance into closer alignment with one's asserted gender identity, such as puberty blockers, cross-sex hormone therapy, and various surgical interventions. The primary therapeutic purpose of social transitioning is to relieve the psychological distress associated with having a mismatch between one's natal sex and gender identity.

34. The World Professional Association for Transgender Health ("WPATH") describes itself as a non-profit, interdisciplinary professional and educational organization devoted to transgender health.

35. Among other things, WPATH produces a set of recommendations for transgender healthcare. Its "Standards of Care" document ("SOC") is one of the more widely known and cited set of guidelines for transgender care.

36. WPATH's recommendations are not universally agreed upon by professionals in the field, and there is significant debate over whether WPATH's guidance meets the standards of evidence-based medicine. However, setting aside the controversy surrounding WPATH and whether its SOCs should be relied upon by medical professionals, even WPATH's own recommendations support involving parents when children and adolescents ask to transition their gender.

37. Aside from a few limited exceptions, medical and mental-health providers generally cannot see or treat a minor without informed consent from the parent(s)/legal guardian(s), both as a matter of state laws and as a matter of medical ethics. *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, WPATH, International J. Trans. Health 2022, Vol. 23, No. S1, S1–S258 (2022), *available at* https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("WPATH SOC8") at S61 ("In most settings, for minors, the legal guardian is integral to the informed consent process: if a treatment is to be given, the legal guardian (often the parent[s]/caregiver[s]) provides the informed consent to do so.").

38. This is because children and adolescents lack the "skills for future thinking, planning, big picture thinking, and self-reflection" that are necessary for informed decision-making. *Id.* at S62.

39. Minors' decisions are often influenced by factors that are unrelated to their long-term best interests, such as "a sense of urgency that stems from hypersensitivity to reward," a "heightened focus on peer relationships," and "increased risk-taking behaviors." *Id.* at S44. In light of the ongoing and unfinished development of emotional and cognitive maturity during childhood and adolescence, "[i]n most settings, for minors, the legal guardian is integral to the informed consent process." *Id.* at S61.

40. Parental involvement is also necessary as a practical matter. Many children and adolescents could not get to any appointments with a mental-health provider without their parents' assistance. And most children and adolescents do not have their own health insurance and would have no way to pay for those appointments.

41. Parental involvement is also important for accurate diagnosis, as parents often have a critical perspective on the history and likely causes of a child's or adolescent's gender questioning feelings. Parents are often the only people who have frequently and regularly interacted with a child or adolescent throughout the child's or adolescent's entire life, and therefore they have a unique view of the child's development over time. Indeed, parents often have more knowledge than even the child or adolescent does of whether their child or adolescent exhibited any signs of gender incongruence or gender dysphoria during the earliest years of life.

42. Thus, parental involvement is a critical part of the diagnostic process to evaluate how long the child or adolescent has been experiencing gender incongruence, evaluate whether there might be any external cause of those feelings, and predict how likely those feelings are to persist.

43. WPATH, for example, notes that "parent(s)/caregiver(s) may provide key information for the clinical team, such as the young person's gender and overall developmental, medical, and mental health history as well as insights into the young person's level of current support, general functioning, and well-being." *Id.* at S58.

44. And, as WPATH notes, "a parent/caregiver report may provide critical context in situations in which a young person experiences very recent or sudden self-awareness of gender diversity and a corresponding gender treatment request, or when there is concern for possible excessive peer and social

media influence on a young person's current self-gender concept." *Id.* Thus, the reconstructed history from a child or adolescent often does not match the reported history from the parent. Likewise, children and adolescents often acknowledge that they have consumed many hours of social media from other transgender-identifying youth and have absorbed these experiences in some personal way.

45. Indeed, WPATH's SOC8 recommends "involving parent(s) or primary caregiver(s) in the assessment process . . . in almost all situations," and adds that "including parent(s)/caregiver(s) in the assessment process to encourage and facilitate increased parental understanding and support of the adolescent may be one of the most helpful practices available." *Id.* This is why it is critical that healthcare providers, parents, and the child work together and come to consensus about the truth about each individual child. This requires healthcare providers to meet with the parent(s) before seeing a child or adolescent to get their perspective on when, where, and how their child's feelings began and to continue to meet with parents throughout the assessment process, as necessary.

46. Given the need for informed consent, as explained above, parental involvement is a necessary prerequisite for any kind of treatment by a medical professional. For example, a child experiencing depression/anxiety related to gender incongruence ordinarily could not receive counseling or medication to treat the depression/anxiety without the informed consent of a parent/guardian.

47. Parents should also be involved to make important decisions about next steps for their minor child or adolescent, especially given the complicated risk-benefit calculus in this context and the limited knowledge about long-term effects and outcomes.

48. WPATH recommends that mental health providers "should provide guidance *to parents/caregivers* and supports to a child when a social gender transition is being considered" and to "facilitate the parents/caregivers' success in making informed decisions about the advisability and/or parameters of a social transition for their child." *Id.* at S78.

49. Thus, a school-facilitated transition without parental knowledge and buy-in interferes with the parents' ability to pursue a careful, investigative assessment before undergoing a gender identity transition. If a school facilitates a social transition at school without parental knowledge and buy-in, it necessarily interferes with the parents' ability to take a cautious approach and pursue an evaluation and assessment before allowing their child or adolescent to make significant changes to their identity. A school-

facilitated transition without parental knowledge also interferes with parents' ability to pursue a treatment approach that does not involve an immediate transition—such as an exploratory process to understand the cause of the feelings or self-perceptions of gender incongruence.

50. A school-facilitated transition over the objection of parents (or, possibly worse, without their knowledge) necessarily creates tension in the parent-child relationship. A common principle in the training for psychotherapists who work with children and adolescents is to never create or aggravate any tensions in the parent-child relationship. By facilitating a social transition at school over the parents' objection or without their knowledge, a school would drive a wedge between the parent and child.

51. Similarly, facilitating a double life for some children, in which they present as transgender in some contexts but not in other contexts, is not in their best interest.

52. WPATH recognizes that "social transition for children typically can only take place with the support and acceptance of parents/caregivers." *Id.* at S77. Likewise, "adolescents are typically dependent on their caregivers/parents for guidance in numerous ways," including as they "navigate[] through the process of deciding about treatment options." *Id.* at S49.

53. As WPATH notes elsewhere, "[p]arent and family support of TGD youth is a primary predictor of youth well-being." *Id.* at S58. Circumventing, bypassing, or excluding parents from decisions about a social transition undermines the main support structure for a child or adolescent who desperately needs support.

54. Indeed, Plaintiffs are not aware of any professional body that has endorsed school-facilitated social transitions without parental knowledge.

55. Thus, when a child presents with a desire to use a new name or pronouns, the very first step should be to notify parents and involve them in the process of considering whether the child should undergo a careful professional assessment by a mental health professional with expertise in child gender incongruence.

***Parental Notification Policies Are Both Constitutional and Necessary***

56. PK-12 minor students, most of whom are too young to drive, vote, or provide medical consent for themselves, are also too young to make life-altering decisions about their expressed gender identity without their parents' knowledge.

57. But that is precisely what AB 1955 enables, with severe consequences for children too young to fully comprehend them.

58. A number of school districts in California had, prior to AB 1955's passage, enacted policies designed to protect students and to protect parents' rights "to determine, without undue interference by the State, how best to raise, nurture, and educate the child." *Troxel v. Granville,* 350 U.S. 57, 67-68 (2000).

59. For example, Plaintiff CVUSD's Board Policy 5010 provides, in relevant part, that parents be notified "in writing, within three days from the date any District employee, administrator, or certified staff, becomes aware that a student is requesting to change any information contained in the student's official or unofficial records." Plaintiff AUHSD adopted a virtually identical policy entitled Board Policy 5010.11.

60. To the extent that a child requests that their school facilitate socially transitioning the student by, for example, changing their preferred name or pronouns that are reflected on official or unofficial records, Board Policies 5010 (CVUSD) and 5010.11 (AUHSD) require that parents be notified of that change to their child's records.

61. Plaintiff OCBE's Board Policy 600-2 provides, in relevant part, that "[p]arents/guardians should have the right to access, participate in, and be notified regarding all aspects of their children's educational program," including the right "to be notified of their children's preferred use of gender pronouns."

62. District Plaintiffs are not alone. *See, e.g.*, Murietta Valley Unified School District Board Policy 5020; Orange Unified School District Board Policy 5020; Rocklin Unified School District Board Policy 5020; Temecula Valley Unified School District Board Policy 5020.

63. Social transition is an impactful psychotherapeutic intervention. It may or may not be the best therapeutic approach for any specific child. Parents must be notified and involved in the process to determine whether social transition is appropriate. CVUSD's Board Policy 5010 and AUHSD's Board Policy 5010.11, for example, facilitate this process when a child's request to socially transition requires changes to the student's official or unofficial school records. Any contrary policies that may require an immediate social transition of children who request it may increase persistence among children who may

11
FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

have desisted had they received evaluation by a competent mental health professional. Persistence for such children is not in their best long-term interest.

64. Parental notification policies, like those adopted by District Plaintiffs and other school districts, are consistent with best practices relating to parental notification when a child or adolescent expresses a desire to be socially transitioned at school insofar as they encourage and facilitate maintaining the relationship between parents and their children. Best mental health practices abhor activity that maintains secrets between children and their parents, which creates distrust and tension. Parental consent is required to provide medical and psychological treatment to minors. In part, this is because the science of mental health recognizes that the best evidence regarding a minor's mental and emotional well-being comes from first-hand accounts by parents, rather than potentially biased accounts from immature children.

## CLAIMS FOR RELIEF

### First Claim for Relief:

### Violation of Substantive Due Process of the Fourteenth Amendment to the U.S. Constitution: Violation of Parental Rights

### (Parent Plaintiffs/All Defendants)

65. The allegations contained in all preceding paragraphs are incorporated herein by reference.

66. The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

67. Parents have a constitutional right "to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57 (2000). This includes the right to direct their children's upbringing and education. *Meyer v. Nebraska*, 262 U.S. 390 (1923); *Pierce v. Society of Sisters*, 269 U.S. 510 (1925); *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

68. Parental rights are not secondary to the desires of government agencies. "Simply because the decision of a parent is not agreeable to a child, or because it involves risks, does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Parham v. J.R.*, 442 U.S. 584, 603 (1979).

69. Parents also have "broad parental authority over minor children." *Id.* And there is an "assumption that minors will benefit from consultation with their parents." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 895 (1992), overruled on other grounds by *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

70. "The fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child." *Parham,* 442 U.S. at 603. And children themselves lack the "maturity, experience, and capacity for judgment required for making life's difficult decisions." *Id.* at 602.

71. Prescribing pronouns and facilitating a social transition is making a significant decision about a child's health and welfare. Gender transition is life-altering and implicates related medical issues that require the parents' care and attention.

72. The Parent Plaintiffs are entitled to declaratory relief; temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of AB 1955; and attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

**Second Claim for Relief:**

**Violation of Free Exercise Clause of First Amendment to U.S. Constitution:**

**Not Generally Applicable due to Comparable Exemptions**

**(Parent Plaintiffs/All Defendants)**

73. The allegations contained in all preceding paragraphs are incorporated herein by reference.

74. Parents have a right to control "the religious upbringing and education of their minor children," which is protected by strict scrutiny under the Free Exercise Clause. *Wisconsin v. Yoder,* 406 U.S. 205, 231 (1972); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020).

75. The Parent Plaintiffs have each alleged that they are devout Christians who believe God created man and woman as distinct, immutable genders; their religious beliefs require that they be notified if their child requests to socially transition at school so that they may be involved with their child's treatment at school.

76. AB 1955 prevents school districts from adopting parental notification policies and protects teachers and other school employees who choose to violate the Parent Plaintiffs' rights secured by the Free

Exercise Clause by willfully withholding critical information from parents concerning changes to their child's gender identity or gender expression.

77. Compelling the Parent Plaintiffs to allow their child's school to socially transition their child to a new gender without their knowledge or involvement violates the Parent Plaintiffs' rights to direct the upbringing of their children in accordance with their religious beliefs.

78. The Parent Plaintiffs are entitled to declaratory relief; temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of AB 1955; and attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

**Third Claim for Relief:**

**The Family Educational Rights and Privacy Act preempts AB 1955's ban on informing parents of their child's gender identity.**

**(All Plaintiffs/All Defendants)**

79. The allegations contained in all preceding paragraphs are incorporated herein by reference.

80. The Family Educational Rights and Privacy Act governs communications between a school and the parents of a student regarding that student's education and education records. 20 U.S.C. § 1232g.

81. FERPA defines "education records" as documents that "contain information directly related to a student" and "are maintained by an educational agency or institution." 20 U.S.C. § 1232g(a)(4)(A).

82. Schools that receive federal funds must guarantee parental access to student education records and the ability to contest and correct errors within those records. 20 U.S.C. § 1232g(a)(2); *Owasso Indept. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 435 (2002).

83. Any record created by a school pertaining to a child's gender "transition" would necessarily be a record that "contain[s] information directly related to a student" and is "maintained by an educational agency" and therefore falls within the coverage of FERPA.

84. As such, those records must be accessible to parents.

85. To the extent a child requests to socially transition at school by changing their name or pronouns, and to the extent that information must be reflected in school records in accordance with FERPA,

AB 1955 therefore compels District Plaintiffs' employees to violate FERPA and deprives the Parent Plaintiffs of their rights under FERPA.

86. Plaintiffs are entitled to declaratory relief; temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of AB 1955; and attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

**Fourth Claim for Relief:**

**Declaratory (under 28 U.S.C. § 2201(a)) and Injunctive Relief
On the Basis of Federal Constitutional Preemption**

**(District Plaintiffs/All Defendants)**

87. The allegations contained in all preceding paragraphs are incorporated herein by reference.

88. AB 1955 compels District Plaintiffs CVUSD, AUHSD, and OCBE to allow their employees to violate parents' constitutional and statutory rights.

89. As government agencies and employees thereof, District Plaintiffs must comply with the U.S. Constitution or risk monetary liability. Indeed, each of the District Plaintiffs' board members took oaths to support and defend the Constitution prior to taking office.

90. District Plaintiffs assert that AB 1955 is preempted by federal constitutional law and impermissibly interferes with parental rights. *See Cal. Rest. Ass'n v. City of Berkeley*, 547 F. Supp. 3d 878, 888 (N.D. Cal. 2021), *jurisd. aff'd, merits rev'd*, 89 F.4th 1094 (9th Cir. 2024) (cleaned up) ("[W]hen a plaintiff seeks to enjoin state action because federal law preempts it, jurisdiction is proper.").

91. District Plaintiffs seek a determination that the First and Fourteenth Amendments preclude the government—namely, public school teachers and other employees—from withholding information from parents regarding changes to their child's gender identity or expression. By requiring District Plaintiffs to adhere to AB 1955's prohibition of adopting policies that tell all parents information to which those parents are entitled under the U.S. Constitution, District Plaintiffs would be required to violate the oaths their members took to defend and uphold the Constitution.

92. There is no plain, speedy, and adequate remedy at law to protect District Plaintiffs' rights. Therefore, District Plaintiffs seek a declaration from this Court that AB 1955 violates the U.S. Constitution.

93. District Plaintiffs are entitled to declaratory relief; temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of AB 1955; and attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

**Fifth Claim for Relief (Alternative Claim):**

**Declaratory Relief (under 28 U.S.C. § 2201(a))**

**(Plaintiffs CVUSD and AUHSD/All Defendants)**

94. The allegations contained in all preceding paragraphs are incorporated herein by reference and, specifically, the allegations contained in the Fourth Claim for Relief.

95. Because Plaintiffs CVUSD's and AUHSD's parental notification policies (Board Policies 5010 and 5010.11, respectively) do not discuss or even mention gender—and instead only require parents to be notified if a student requests to change their official or unofficial school records—Plaintiffs CVUSD and AUHSD assert that their Board Policies 5010 and 5010.11, respectively, fall outside of the scope of AB 1955.

96. In the event the Fourth Claim for Relief is denied, Plaintiffs CVUSD and AUHSD are entitled to alternative declaratory relief in the form of a declaration that Board Policies 5010 (CVUSD) and 5010.11 (AUHSD) do not violate AB 1955 and that those policies may be enforced.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants for the following:

A. An order and judgment declaring that AB 1955 violates the First Amendment to the U.S. Constitution;

B. An order and judgment declaring that AB 1955 violates the Fourteenth Amendment to the U.S. Constitution;

C. An order and judgment declaring that AB 1955 violates the Family Educational Records and Privacy Act;

D. An order temporarily, preliminary, and permanently enjoining and prohibiting Defendants from enforcing AB 1955;

E. In the alternative, an order and judgment that Plaintiff CVUSD's Board Policy 5010 and Plaintiff AUHSD's Board Policy 5010.11 do not violate AB 1955;

F. Attorneys' fees and costs; and

G. Any other relief as this Court deems just and proper.

                                                  Respectfully Submitted,

Dated: August 8, 2024                        LIBERTY JUSTICE CENTER

                                          By: *Emily Rae*
                                               Emily Rae
                                               Attorney for Plaintiffs