LIBERTY JUSTICE CENTER
Emily Rae (State Bar No. 308010)
erae@ljc.org
Noelle Daniel (admitted *pro hac vice*)
ndaniel@ljc.org
13341 W. U.S. Highway 290
Building 2
Austin, Texas 78737

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHINO VALLEY UNIFIED SCHOOL DISTRICT, a local educational agency; ANDERSON UNION HIGH SCHOOL DISTRICT, a local educational agency; ORANGE COUNTY BOARD OF EDUCATION, a local educational agency; OSCAR AVILA, an individual; MONICA BOTTS, an individual; JASON CRAIG, an individual; KRISTI HAYS, an individual; COLE MANN, an individual; VICTOR ROMERO, an individual; GHEORGHE ROSCA, JR., an individual; and LESLIE SAWYER, an individual; | Case No. 2:24-cv-01941-DJC-JDP<br><br>**RESPONSE TO DEFENDANTS' MOTION TO DISMISS**<br><br>Courtroom:    10<br>Judge:         The Honorable Daniel J. Calabretta<br>Trial Date:    December 19, 2024<br>Action Filed:  July 16, 2024 |
| Plaintiffs, | |
| v. | |
| GAVIN NEWSOM, in his official capacity as Governor of the State of California; ROBERT BONTA, in his official capacity as Attorney General of the State of California; and TONY THURMOND, in his official capacity as California State Superintendent of Public Instruction; | |
| Defendants. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................4

INTRODUCTION ........................................................................................................9

BACKGROUND ........................................................................................................10

    **I.**      AB 1955 ..........................................................................................10

    **II.**     Claims ...........................................................................................11

LEGAL STANDARD ..................................................................................................11

ARGUMENT .............................................................................................................11

    I.       The Court Has Subject Matter Jurisdiction to hear all Claims ...........................11

         A.      Parent Plaintiffs have standing to sue. ................................................11

              i.       Plaintiffs allege concrete injury. .................................................12

              ii.      Parent Plaintiffs have standing under the Fourteenth Amendment ..........13

              iii.     Parent Plaintiffs have standing under the First Amendment ....................14

              iv.     Parent Plaintiffs' claims are redressable. ....................................16

         B.      FERPA preempts AB 1955's ban on informing parents of their child's gender identity; a specific private right of action is not necessary. .......................16

         C.      The LEA Plaintiffs have standing to bring their claims. ..........................18

         D.     The Court has jurisdiction to hear Plaintiffs' claim for declaratory relief..........20

         E.      The Governor does not enjoy Eleventh Amendment immunity here because he has a "fairly direct" connection with the enforcement of AB 1955.................20

              i.       *Ex parte Young* exception precedent permits Plaintiffs to sue state officials acting in their official capacity. ........................................21

              ii.      The California governor enjoys significant authority over State education. ...................................................................................22

              iii.     Governor Newson has a "fairly direct" connection to the enforcement of AB 1955................................................................23

    **II.**     Plaintiffs State Cognizable Claims as a Matter of Law. ....................................24

         A.      Plaintiffs need not show that AB 1955 is invalid in every circumstance. .............24

B.       Parents' Substantive Due Process Rights Include the right to be informed on their child's health and well-being at school. ...................................................25

       i.       Parents have a right to control the upbringing of their children, including in the educational sphere...........................................................25

       ii.      AB 1955 implicates parental rights related to medical care for their children. ...........................................................................................27

C.       Strict scrutiny applies here because AB 1955 infringes on Parent Plaintiffs' fundamental right to direct the upbringing of their children................................28

D.       Parent Plaintiffs Have Stated a Viable Free Exercise Claim Because the Act is Not Neutral and Generally Applicable, and Does Not Meet the Least Restrictive Means Test..........................................................................................29

E.       FERPA preempts AB 1955. ..............................................................................32

CONCLUSION..................................................................................................................33

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS (2:24-CV-01941-DJC-JDP)

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ...................................................................11

*Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, 2004 U.S. Dist. LEXIS 19530, No. C 04-02266 JW (N.D. Cal. Sep. 15, 2004) ................................11

*Arizona Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002 (9th Cir. 2003) .......................14

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) .........................................19

*Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084 (E.D. Cal. 2002) ........................................22

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937 (9th Cir. 2013) ..................................................................................................21, 22

*Bacon v. Woodward*, 104 F.4th 744 (9th Cir. 2024) ................................................31

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ...................................................11

*Bellotti v. Baird*, 443 U.S. 622 (1979) .................................................................26

*Boerne v. Flores*, 521 U.S. 507, 534 (1997) ...........................................................32

*Braunfeld v. Brown*, 366 U.S. 599 (1961) .............................................................14

*Brekke v. Wills*, 125 Cal. App. 4th 1400 (2005) ......................................................26

*Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011).....................15, 26, 27

*Burwell v. Hobby Lobby Stores*, Inc., 573 U.S. 682 (2014)........................................32

*Cal. Dep't of Educ. v. Rocklin Unified Sch. Dist.*, Case No. S-CV-0052605 (Cal. Super. Ct. Cty. of Placer Apr. 10, 2024) ................................................................18

*California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088 (9th Cir. 2003) .........................14

*California School Boards Ass'n v. Brown,* 192 Cal. App. 4th 1507, 122 Cal. Rptr. 3d 674 (2011) ....................................................................................................23

*California v. Chino Valley Unified Sch. Dist.*, Case No. CIVSB2317301 (Cal. Super. Ct. Cty. of San Bernardino Aug. 28, 2023) ........................................................18

*Cervantes v. City of San Diego*, 5 F.3d 1273 (9th Cir. 1993) .........................................32

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993)..................................31

*Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504 (1992) ...........................................17, 33

*City of Chicago v. Sessions*, 888 F.3d 272, 278 (7th Cir. 2018)........................................15

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) .....................................................24

*City of South Lake Tahoe v. Cal. Tahoe Reg'l Plan. Agency*, 625 F.2d 231 (9th Cir. 1980) ...................19

*Coria v. Garland*, 96 F.4th 1192 (9th Cir. 2024)...........................................................20

*Doe v. Madison Metro. Sch. Dist.*, No. 20-cv-454 (Wis. Cir. Ct., Dane Cnty., Sep. 28, 2020) ..........................................................................................................................29

*Duke Energy Trading and Marketing, L.L.C. v. Davis*, 267 F.3d 1042 (9th Cir. 2001)...........................22

*Employment Div. v. Smith*, 494 U.S. 872 (1990) ........................................................14

*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) ...........................................................11

*Ex parte Young*, 209 U.S. 123 (1908) ..............................................................19, 21

*Farrington v. Tokushige*, 11 F.2d 710 (9th Cir. 1926) ..................................................26

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664 (9th Cir. 2023) ...............................................................................................15, 16, 30, 31

*Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U.S. 141 (1982)..........................17, 33

*Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197 (9th Cir. 2005) ......................................25, 29

*Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187 (9th Cir. 2006) ..................................25, 26, 29

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021)...........................................15, 16, 30, 31

*Green v. Miss United States of Am., LLC*, 52 F.4th 773 (9th Cir. 2022) ...............................32

*Hardwick v. Bd. of Sch. Trustees*, 54 Cal. App. 696 (1921) ..........................................29

*Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715 (9th Cir. 2024)...........................27

*Hernandez v. City of El Monte*, 138 F.3d 393 (9th Cir. 1998)..........................................11

*Iancu v. Brunetti*, 588 U.S. 388 (2019)..................................................................32

*Indian Oasis-Baboquivari Unified Sch. Dist. No. 40 v. Kirk*, 91 F.3d 1240 (9th Cir. 1996)....................19

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ................................................14

*L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697 (9th Cir.1992) ..............................................21

*Lujan v. Defenders of Wildlife*, 505 U.S. 555 (1992) ................................................19

*M'Culloch v. Maryland*, 17 U.S. 316 (1819) ........................................................17, 33

*Mann v. Cnty. of San Diego*, 907 F.3d 1154 (9th Cir. 2018) ..........................................27

*Meyer v. Nebraska*, 262 U.S. 390 (1923) ...........................................................13, 26

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) ........................................................20

*Mirabelli v. Olson*, 691 F. Supp. 3d 1197  (S.D. Cal. 2023)..........................................28, 30

*Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024)...................................................25

*Owasso Indept. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426 (2002) ..................................................18, 33

*Pacific Gas & Elec. Co. v. State Energy Resources Conservation and Development Comm'n*, 461 U.S. 190 (1983) ........................................................17, 33

*Parents for Priv. v. Barr*, 949 F.3d 1210 (9th Cir. 2020) ....................................................25

*Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007)........................................................................12, 13

*Parham v. J. R.*, 442 U.S. 584 (1979)........................................................27

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 269 U.S. 510 (1925).......13, 15, 26, 27

*Prince v. Mass.*, 321 U.S. 158 (1944)........................................................26, 29

*Prison Legal News v. Ryan*, 39 F.4th 1121 (9th Cir. 2022)........................................................25

*Ricard v. Geary Cnty. Unified Sch. Dist. 475*, No. 5:22-cv-4015, 2022 WL 1471372 (D. Kan. May 9, 2022) ........................................................13, 18, 28, 33

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020)................................................14, 15, 30

*S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021)........................................31, 32

*S. Lake Tahoe v. Calif. Tahoe Reg'l Plan. Agency*, 625 F.2d 231 (9th Cir. 1980)...................................18

*San Diego Unified Port Dist. v. Gianturco*, 457 F. Supp. 283 (S.D. Cal. 1978) ...................................18

*San Diego Unified Port Dist.*, 651 F.2d 1306 (9th Cir. 1981) ....................................................19

*San Juan Capistrano v. Calif. Pub. Utilities Comm'n*, 937 F.3d 1278, 1282 (9th Cir. 2019)...................19

*Schall v. Martin*, 467 U.S. 253 (1984) ........................................................27

*Sherbert v. Verner*, 374 U.S. 398 (1963) ........................................................30

*Star-Kist Foods, Inc. v. Cnty. of Los Angeles*, 42 Cal. 3d 1 (1986)........................................................18

*State Bd. of Education v. Honig*, 13 Cal. App.4th 720 (1993) ..................................................23

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)........................................................12

*Sweat v. Hull*, 200 F.Supp. 2d 1162 (D. Ariz. 2001) ........................................................22

*T.F. v. Kettle Moraine Sch. Dist.*, No. 21-cv-1650 (Wis. Cir. Ct., Waukesha Cnty., Oct. 3, 2023) ........................................................13, 28

*Tandon v. Newsom*, 593 U.S. 61 (2021) ........................................................16, 31

*Tenn. v. Cardona*, No. 2:24-cv-72, 2024 WL 3019146 (E.D. Ky. June 17, 2024)............................13, 28

*Thomas v. Review Bd. of Ind.*, 450 U.S. 707 (1981) ........................................................30

*Tracht Gut, LLC v. L.A. Cnty. Treasurer & Tax Collector*, 836 F.3d 1146 (9th Cir. 2016) ...................11

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .................................................................12

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017)............................30

*Troxel v. Granville*, 530 U.S. 57 (2000) ......................................................................13, 29, 32

*United States v. Salerno*, 481 U.S. 739 (1987) ...........................................................................24

*Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247 (2011) ...............................................19, 20

*Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 2000)......................................................................27

*Waln v. Dysart Sch. Dist.*, 54 F.4th 1152 (9th Cir. 2022) ..........................................................31

*Warm v. Seldin*, 422 U.S. 490 (1975) .........................................................................................11

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)............................25

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ............................................................25, 27, 29

*Welchen v. Bonta*, 630 F. Supp. 3d 1290 (E.D. Cal. 2022) ........................................................22

*Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021)............................................................20

*Willey v. Sweetwater Cnty. Sch. Dist. No. 1*, 680 F. Supp. 3d 1250, 1279-80 (D. Wyo.
  2023) .........................................................................................................................................29

*Williams v. Gerber Prods. Co.*, 552 F.3d 934 (9th Cir. 2008)...................................................11

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ........................................................................13, 14, 26, 29

## **Statutes**

Cal. Educ. Code § 220.3 ..............................................................................................................10

Cal. Educ. Code § 220.5(a)..........................................................................................................10

Cal. Educ. Code § 51101(a)(1) ....................................................................................................31

Cal. Educ. Code § 51101(a)(10) ..................................................................................................31

Cal. Gov't Code § 13337 ..............................................................................................................23

## **Other Authorities**

41A California Forms of Pleading and Practice--Annotated § 473.16 (2024) ...........................23

Kasia Kozlowska, et al., *Attachment Patterns in Children and Adolescents With Gender
  Dysphoria*, 11 Front Psychol. 1, 1 (Jan. 12, 2021), https://www.frontiersin.org/
  articles/10.3389/fpsyg.2020.582688/full ..............................................................................28

*Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*,
  WPATH, International J. Trans. Health 2022, Vol. 23, No. S1, S1–S258 (2022) ...............28

**<u>Constitutional Provisions</u>**

U.S. Const. amend. I .................................................................................................................14

U.S. Const. amend. XIII, § 2.....................................................................................................21

U.S. Const. amend. XIV ............................................................................................................13

U.S. Const. art. VI, cl. 2......................................................................................................17, 33

**INTRODUCTION**

Numerous studies have found that transgender-identifying and gender nonconforming students suffer from increased psychological, emotional, and physical harassment and abuse, and that transgender-identifying youth experience an abnormally high number of suicidal thoughts and make an abnormally high number of suicide attempts.

Faced with these concerns, various California school districts have adopted policies under which the schools respect the wishes of students who ask to be treated as a gender different from their natal sex, while also making parents aware that the school is participating in the social transition of their child. These policies ensure that school districts do not betray the extraordinary trust placed in them by parents, who otherwise would be misled about a monumental change to the development of their child and to that child's official and unofficial school records.

These parental notification policies often address not only gender transition but also myriad other issues that parents would want or need to know about their child's education and development. For example, if a student is injured, bullied, or exhibits suicidal behavior at school, but does not want their parents to know, a school will nonetheless notify the parents. If a student breaks their arm, hits their head, or develops a fever, the school will immediately tell the student's parents. If a student is involved in a verbal or physical fight, the school will tell the parents. If a student expresses a desire to hurt or kill themself, the school will tell the parents. So, too, must a school tell parents if a student has asked the school to participate in that student's gender transition.

But through Assembly Bill 1955 ("AB 1955"), California now seeks to bar schools from adopting policies that would require notifying parents when their children may be at increased risk of psychological, emotional, and physical harassment and abuse, and extremely high rates of suicide and suicide attempts. Specifically, AB 1955 states that a "school district . . . shall not enact or enforce any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's . . . gender identity[] or gender expression to *any other person* without the pupil's consent . . . ." (emphasis added). This means that a school district is forbidden from adopting a policy that would tell a child's parents the school is socially transitioning their child without the minor's "consent"—for children of any age, no matter how young.

This action is brought by Chino Valley Unified School District, Anderson Union High School District, Orange County Board of Education, and certain California parents of children in the public school system who seek to bar California from implementing AB 1955 because it violates the First and Fourteenth Amendments and the Family Educational Rights and Privacy Act ("FERPA").

**BACKGROUND**

**I.   AB 1955**

On July 15, 2024, Defendant Governor Newsom signed AB 1955 into law. Absent judicial intervention, AB 1955 will take effect January 1, 2025. AB 1955 makes several changes to the California Education Code regarding the treatment of children who request to "socially transition" their gender at school, which refers primarily to adopting a new name and/or pronouns that differ from one's natal sex.

AB 1955 provides in relevant part that "[a]n employee or a contractor of a school district . . . shall not be required to disclose any information related to a pupil's . . . gender identity[] or gender expression to any other person without the pupil's consent." Cal. Educ. Code § 220.3. AB 1955 also prohibits all California school districts from "enact[ing] or enforc[ing] any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's . . . gender identity[] or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law." Cal. Educ. Code § 220.5(a). AB 1955 further provides that "[a]ny policy, regulation, guidance, directive, or other action of a school district . . . that is inconsistent with" the previous section "is invalid and shall not have any force or effect." *Id.* § 220.5(c).

Taken together, these provisions upend the traditional relationship between students, their parents, and their teachers. Notably, AB 1955 includes within its scope all students in California school districts—including students in high school, middle school, elementary school, kindergarten, and even preschool. This means that if a four-year-old student requested to change their gender at school, school policy could not call for notifying the parents without the four-year-old's consent.

Notifying parents of significant events that impact their children at school—such as when they are injured, bullied, or express a desire to self-harm—is, of course, the norm. But AB 1955 carves out special exceptions for school policies that have the effect of notifying parents if their child asks their school to facilitate the child's social transition due to changes in their gender identity.

10

## II. Claims

Parent Plaintiffs bring claims alleging that AB 1955 violates the Due Process Clause of the Fourteenth Amendment and the Free Exercise Clause of the First Amendment, as well as a claim that alleging that FERPA preempts AB 1955. Compl. ¶¶ 66-72; 74-78; 80-86. Chino Valley Unified School District (CVUSD), Anderson Union High School District, (AUHSD), and the Orange County Board of Education (OCBOE; collectively, LEA Plaintiffs) are local educational agencies (LEAs) in California. *Id.* ¶¶ 10-12. They join in the Parents' FERPA claim and additionally bring a federal constitutional preemption claim and an alternative claim for declaratory relief. *Id.* ¶¶ 80-86; 88-93; 95-96.

### LEGAL STANDARD

A complaint must not be dismissed when it contains allegations that "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "At the motion to dismiss phase, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff." *Tracht Gut, LLC v. L.A. Cnty. Treasurer & Tax Collector*, 836 F.3d 1146, 1150 (9th Cir. 2016). Granting a motion to dismiss is a "rare situation." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 (9th Cir. 2008). "[D]ismissal is a harsh penalty and, therefore, it should only to be imposed in extreme circumstances." *Hernandez v. City of El Monte*, 138 F.3d 393, 399 (9th Cir. 1998) (cleaned up). And when a complaint is dismissed, the Federal Rules of Civil Procedure favor granting leave to amend. *Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, 2004 U.S. Dist. LEXIS 19530, No. C 04-02266 JW (N.D. Cal. Sep. 15, 2004).

### ARGUMENT

## I. The Court Has Subject Matter Jurisdiction to hear all Claims

### A. Parent Plaintiffs have standing to sue.

Plaintiffs have standing if they have a "personal stake in the outcome of the controversy" that would warrant a court's exercise of its subject matter jurisdiction and remedial powers on that party's behalf. *Warm v. Seldin*, 422 U.S. 490, 498–99 (1975). The question of standing asks only whether the plaintiffs are the proper parties to assert the claims; it makes no determination on their merit. *Eng v. Cooley*, 552 F.3d 1062, 1068 (9th Cir. 2009).

1    Defendants argue that Parent Plaintiffs do not allege any injury beyond a moral objection to the law.

2    Def. Mot. to Dismiss at 7:25-28. However, Parent Plaintiffs allege much more than moral objections; they

3    allege serious violations of their own constitutional rights under the Fourteenth and First Amendments.

4    Defendants completely ignore Parent Plaintiffs' Fourteenth Amendment claims alleging injury to

5    constitutionally recognized parental rights in their motion to dismiss and treat Parent Plaintiffs' serious

6    First Amendment violations as mere personal objections. Defendants' arguments on standing therefore fail

7    and do not warrant dismissal of the Parent Plaintiffs' claims.

### i. Plaintiffs allege concrete injury.

9    Because AB 1955 has yet to take effect, Plaintiffs can establish their standing by demonstrating that

10    injury is certainly impending *or* that there is a substantial risk that harm will occur. *Susan B. Anthony List*

11    *v. Driehaus*, 573 U.S. 149, 158 (2014). Concrete harms that support standing include various intangible

12    harms, such as reputational harm, as well as "harms specified by the Constitution itself." *TransUnion LLC*

13    *v. Ramirez*, 594 U.S. 413, 425 (2021). Standing does not require that the injury will certainly materialize.

14    *Id.* at 206 ("It would not be necessary to decide whether appellants' allegations of impairment of their votes

15    by the 1901 apportionment will, ultimately, entitle them to any relief, in order to hold that they have

16    standing to seek it.").

17    Indeed, the Supreme Court has considered an analogous set of circumstances and recognized parents'

18    standing to challenge a school policy. In that case, a school district adopted a race-based policy to determine

19    which public school students could attend. *Parents Involved in Community Schools v. Seattle School*

20    *District No. 1*, 551 U.S. 701, 709-10 (2007). The district defendant argued that the plaintiff parent

21    organization lacked standing "because none of [its] current members [could] claim an imminent injury"

22    because the parents supposedly would "only be affected if their children [sought] to enroll in a Seattle

23    public high school and [chose] an oversubscribed school that is integration positive." *Id.* at 718. But the

24    Supreme Court rejected that argument that the alleged harm was too speculative, and instead determined:

25    "The fact that it is possible that children of group members will not be denied admission to a school based

26    on their race —because they choose an undersubscribed school or an oversubscribed school in which their

27    race is an advantage—does not eliminate the injury claimed." *Id.* at 718-19. The Court held that the

28

1    imposition of a "race-based system that *may* prejudice the plaintiff" constituted constitutional injury. *Id.* at

2    719 (emphasis added).

3        The same is true here. Plaintiffs have alleged that a policy (AB 1955) with systemic effects—reaching

4    all students at public schools in California—that Plaintiffs are forced into, causes them harm as parents

5    with children in those schools. Thus, they have alleged constitutional injury sufficient to confer standing.

6    *Id*. The injury here is threatened and ongoing because the District Plaintiffs along with the Parent Plaintiffs

7    and their children are subject to AB 1955 under which the Parents are deliberately being excluded from

8    the discussion about gender and gender transition, which "*may* prejudice" them. *Id.* (emphasis added).

9                    **ii.   Parent Plaintiffs have standing under the Fourteenth Amendment**

10       The Fourteenth Amendment to the U.S. Constitution provides that no State shall "deprive any person

11   of life, liberty, or property, without due process of law." U.S. Const. amend. XIV; Compl. ¶ 66. The

12   Supreme Court has "recognized the fundamental right of parents to make decisions concerning the care,

13   custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 68 (2000) (plurality).  This

14   includes the right to direct their children's upbringing and education. *Meyer v. Nebraska*, 262 U.S. 390

15   (1923); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 269 U.S. 510 (1925); *Wisconsin

16   v. Yoder*, 406 U.S. 205 (1972).

17       At least three courts have found that parent plaintiffs have standing to sue regarding parental

18   involvement in social transitioning or pronoun usage at school *T.F. v. Kettle Moraine Sch. Dist.*, No. 21-

19   cv-1650 (Wis. Cir. Ct., Waukesha Cnty., Oct. 3, 2023) (finding that socially transitioning a child without

20   parental consent is "undisputedly a medical and healthcare issue" constituting "an infringement against the

21   parental autonomy right to direct the care for their child" requiring the application of strict scrutiny); *Tenn.

22   v. Cardona*, No. 2:24-cv-72, 2024 WL 3019146, at \*30-31 (E.D. Ky. June 17, 2024); *Ricard v. Geary Cnty.

23   Unified Sch. Dist. 475*, No. 5:22-cv-4015, 2022 WL 1471372, at \*8 (D. Kan. May 9, 2022) (discussing

24   parental right to "contest[] the use of pronouns for their child.")

25       When schools withhold information from parents precisely because parents might want to know—as

26   AB 1955 would have it—schools violate these fundamental parental rights. In doing this, AB 1955

27   directly interferes with parents' ability to direct the upbringing and education of their children, causing

28   injury. AB 1955 gives government agencies, in the form of public schools, primary rights ahead of

parents by withholding serious information about children from their parents. This violates parents' fundamental liberty interest in the upbringing of their children, constituting injury sufficient to confer Article III standing.

### iii.   Parent Plaintiffs have standing under the First Amendment

A plaintiff has standing to attack a statute under the Free Exercise Clause if he shows that "his good-faith religious beliefs are hampered" by said statute. *Braunfeld v. Brown*, 366 U.S. 599, 615 (1961). The Supreme Court "has dispensed with rigid standing requirements" for First Amendment claims. *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) (citations omitted); *see also Arizona Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) ("[W]hen the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing.")

Defendants frame Parent Plaintiffs' serious First Amendment claims as a "general moral objection" insufficient to confer standing. Def. Mot. to Dismiss at 7:26. But the Complaint makes no allegations about morals or morality. Instead, Parent Plaintiffs allege a violation of the Free Exercise Clause of the First Amendment, which states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. The Free Exercise Clause does "its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990)). Furthermore, parents have a right to control "the religious upbringing and education of their minor children," which is protected by strict scrutiny under the Free Exercise Clause. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020); *Wisconsin v. Yoder,* 406 U.S. 205, 231 (1972).

Defendants belittle the freedom of religion enshrined in the First Amendment and frame the parents' religious objection as a mere difference of opinion, rather than a violation of sincerely held (or "good faith") religious beliefs. *Brown*, 366 U.S. at 615. Defendants compare Plaintiffs' burden to the plaintiffs in *Yoder*, claiming that while the burden faced by the Amish religious community—under state law making secondary education compulsory until age 16—was substantial, no similar burden exists here. Def. Mot. to Dismiss at 22:14-17. Defendants continue to question and belittle Plaintiffs' sincerely held religious

14

beliefs, stating that Plaintiffs "only" allege that their religious beliefs require they be notified if their child requests to socially transition and that their "real objection" is to "schools acceding to student requests to respect the students' names and pronouns." *Id.* at ¶¶ 17, 25-26. Defendants apparently presume to determine—as the State—that a child living as a different gender at school does not burden the Plaintiffs' religious beliefs. As alleged in the Complaint, the Parent Plaintiffs believe that God created man and woman as distinct, immutable genders. When schools allow children to socially transition to another gender without notifying parents, this greatly burdens their religion. But Defendants seem to think that Plaintiffs' own religious views should simply give way to beliefs and values favored by the State.

Additionally, Defendants seem to think that if Parent Plaintiffs' children have not requested a name/pronoun change (to their knowledge) at school, they do not have standing. Def. Mot. to Dismiss at 8:17-19. But that is the key deception of AB 1955: It leaves unsuspecting parents in the dark about serious matters of their children, so that they never know whether their child has made such a request. According to Defendants, Parent Plaintiffs must predict their child's behavior at school to be awarded standing, and allege that their child would request a name/pronoun change at school without consenting to parental disclosure. Def. Mot. to Dismiss at 8:19-20. However, the Supreme Court has a long history of striking down laws before they go into effect.[1]

The Supreme Court has made clear that regulations that restrict the free exercise of religion must be neutral and generally applicable—and, if they are not, they must satisfy strict scrutiny by being narrowly tailored to serve a compelling state interest. *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 18. A policy is not generally applicable if it "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 686 (9th Cir. 2023) (en banc) (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021)). Government "regulations are not neutral and generally applicable . . . whenever they treat *any* comparable secular activity more favorably than religious exercise." *Fellowship of Christian Athletes*, 82 F.4th at 688 (quoting *Tandon v. Newsom*, 593 U.S. 61, 62

---

[1] For example, in 1925, the Court struck down a law that required minors to attend public school two years before it was intended to go into effect. *Pierce*, 268 U.S. at 535-36. In *Brown v. Entertainment Merchants Association*, businesses challenged a law restricting the sale of violent video games months before the law would go into effect. 564 U.S. 786, 789 (2011); *see also City of Chicago v. Sessions*, 888 F.3d 272, 278 (7th Cir. 2018), *rev'd in part on other grounds*, 961 F.3d 667 (7th Cir. 2020) (cleaned up) (permitting the city to challenge President Trump's Executive Order before it took effect).

(2021)) (emphasis in original). Every time a regulation "invites the government to decide which reasons for not complying with the policy are worthy of solicitude," a court must apply strict scrutiny. *Fulton*, 593 U.S. at 537 (cleaned up).

Here, Parent Plaintiffs are devout Christians who believe that God created man and woman as distinct, immutable genders. Compl. ¶ 75. Their religious beliefs require that they be notified if their child requests to socially transition at school so that they may be involved with their child's treatment at school. *Id.* Compelling Parent Plaintiffs to allow California school districts to socially transition their children to a new gender without their knowledge or involvement, or else withdraw their children from California public schools, hampers Parent Plaintiffs' good-faith religious beliefs and constitutes an injury sufficient to confer standing under the Free Exercise Clause.

### iv.   Parent Plaintiffs' claims are redressable.

Defendants also claim that if Parent Plaintiffs did allege an injury, they still would lack standing because any injury would stem from a decision by an individual or a district policy. Def. Mot. to Dismiss at 8, n.6. According to Defendants, there is no circumstance under which parents can challenge AB 1955, arguing they could never establish causation and redressability. *Id.* However, AB 1955 prohibits all California school districts from "enact[ing] or enforc[ing] any policy, rule, or administrative regulation that would require an employee or a contractor to disclose any information related to a pupil's . . . gender identity[] or gender expression to any other person without the pupil's consent, unless otherwise required by state or federal law." Compl. ¶ 28; Cal. Ed. Code § 220.5(a). AB 1955 further provides that "[a]ny policy, regulation, guidance, directive, or other action of a school district . . . that is inconsistent with" the previous section "is invalid and shall not have any force or effect." Compl. ¶ 29; Cal. Ed. Code § 220.5(c). AB 1955 thus dictates how every district must handle gender identity and invalidates any existing and future policies to the contrary. Thus, any injury stemming from nondisclosure is directly caused by AB 1955, because there is no other policy to blame—AB 1955 invalidated them all.

### B.   FERPA preempts AB 1955's ban on informing parents of their child's gender identity; a specific private right of action is not necessary.

1    Defendant argues that Plaintiffs cannot bring their Family Educational Rights and Privacy Act

2  ("FERPA") claim because the statute does not include a private right of action. Def. Mot. to Dismiss at

3  9:3-9. But Plaintiffs are not asserting a cause of action under FERPA itself; instead, they argue that AB

4  1955 is unconstitutional and unenforceable because FERPA preempts it.

5    When a state law is contrary to a valid federal law, the federal law controls (U.S. Const. art. VI, cl. 2).

6  In conflict preemption, the issue is whether the state law conflicts with federal law either because

7  compliance with both federal and state laws is impossible or because state law is an obstacle to the

8  accomplishment of the purposes and objectives of Congress.

9    Federal law preempts state law when it is impossible to comply with both federal and state law, or

10  when state law stands as an obstacle to the accomplishment of federal objectives. Article VI of the

11  Constitution provides that the laws of the United States "shall be the supreme Law of the Land; . . . any

12  Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

13  Thus, since the Supreme Court's decision in *M'Culloch v. Maryland*, 17 U.S. 316, 427 (1819), it has been

14  settled that state law that conflicts with federal law is "without effect." *Cipollone v. Liggett Grp., Inc.*, 505

15  U.S. 504, 516 (1992).

16    In the absence of an express congressional command, state law is pre-empted if that law actually

17  conflicts with federal law, *see Pacific Gas & Elec. Co. v. State Energy Resources Conservation and*

18  *Development Comm'n*, 461 U.S. 190, 204 (1983), or if federal law so thoroughly occupies a legislative

19  field "as to make reasonable the inference that Congress left no room for the States to supplement it."

20  *Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 153 (1982).

21    FERPA governs communications between a school and the parents of a student regarding that student's

22  education and education records. Compl. ¶ 80; 20 U.S.C. § 1232g. FERPA defines "education records" as

23  documents that "contain information directly related to a student" and "are maintained by an educational

24  agency or institution." Compl. ¶ 81; 20 U.S.C. § 1232g(a)(4)(A). Schools that receive federal funds must

25  guarantee parental access to student education records and the ability to contest and correct errors within

26  those records. Compl. ¶ 82; 20 U.S.C. § 1232g(a)(2); *Owasso Indept. Sch. Dist. No. I-011 v. Falvo*, 534

27  U.S. 426, 435 (2002).

28

FERPA preempts AB 1955 because any record created by a school pertaining to a child's gender "transition" would necessarily be a record that "contain[s] information directly related to a student" and is "maintained by an educational agency" and would therefore fall within the coverage of FERPA. Compl. ¶ 83. FERPA requires that these records be accessible to parents. *See Ricard v. USD 475 Geary County, KS School Board*, No. 5:22-cv-4015, 2022 WL 1471372, *7 (D. Kan. May 9, 2022) (addressing similar policy and noting that FERPA requires that parents have access to all school records about their children). AB 1955 commands school districts to do the exact opposite and to only release such information with the consent of the child, constituting conflict preemption.

### C. The LEA Plaintiffs have standing to bring their claims.

The Defendants argue that Chino Valley Unified School District, Anderson Union High School District, and the Orange County Board of Education ( "LEA Plaintiffs") cannot challenge AB 1955 because they are political subdivisions of the State. Def. Mot. to Dismiss at 10:7-9. But this argument fails.

Plaintiffs recognize that, as a general rule, "subordinate political entities, as 'creatures' of the state, may not challenge state action as violating the entities' rights" under the federal constitution. *Star-Kist Foods, Inc. v. Cnty. of Los Angeles*, 42 Cal. 3d 1, 5 (1986); *see also San Diego Unified Port Dist. v. Gianturco*, 457 F. Supp. 283, 290 (S.D. Cal. 1978). Under this rule, political subdivisions lack standing to sue their State for violating their constitutional rights. *S. Lake Tahoe v. Calif. Tahoe Reg'l Plan. Agency*, 625 F.2d 231, 233 (9th Cir. 1980).

But school districts certainly can sue and be sued as a matter of state and federal law—and can assert federal constitutional law as a defense. In fact, the Attorney General and the California Department of Education have sued school districts over their parental notification policies, and the districts have raised constitutional law as a defense. *See California v. Chino Valley Unified Sch. Dist.*, Case No. CIVSB2317301 (Cal. Super. Ct. Cty. of San Bernardino Aug. 28, 2023); *Cal. Dep't of Educ. v. Rocklin Unified Sch. Dist.*, Case No. S-CV-0052605 (Cal. Super. Ct. Cty. of Placer Apr. 10, 2024).

Here, LEA Plaintiffs are simply preemptively raising the same constitutional arguments they would make if the state sued them for violating AB 1955. There is no reason why they should have to violate the statute and then get sued before resolving this issue. Under Supreme Court precedent, they are allowed to

seek equitable relief now rather than break the law first. *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326-28 (2015) (distinguishing between direct rights of action under the Supremacy Clause and claims in equity, under *Ex parte Young*, 209 U.S. 123 (1908)); *see also Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring) (citing *Ex parte Young*, 209 U.S. at 165-66) (recognizing the availability of pre-emptively asserting federal law as a defense to imminent enforcement action).

Finally, it is true that the Ninth Circuit at one time applied the rule cited by the Defendants to bar Supremacy Clause/preemption challenges. *See City of South Lake Tahoe v. Cal. Tahoe Reg'l Plan. Agency*, 625 F.2d 231 (9th Cir. 1980). But the Ninth Circuit already began to back away from that blanket per se rule just a year later. *See San Diego Unified Port Dist.*, 651 F.2d 1306, 1309 n.7 (9th Cir. 1981) ("While there are broad dicta that a political subdivision may never sue its maker on constitutional grounds, we doubt that the rule is so broad.") (citation to *South Lake Tahoe* omitted). And the lack of any positive circuit citation to *South Lake Tahoe* for its blanket rule for over twenty years provides ample evidence that the Ninth Circuit sees the Supreme Court's subsequent development of standing doctrine to have hollowed out whatever conceptual force *South Lake Tahoe* might once have had.

It is little wonder, then, that Ninth Circuit judges have repeatedly called for en banc reconsideration of *South Lake Tahoe* and its aged progeny to expressly overturn its broad standing rule—one long since implicitly abandoned and irreconcilable with three decades of Supreme Court standing jurisprudence since *Lujan v. Defenders of Wildlife*, 505 U.S. 555 (1992). *E.g., San Juan Capistrano v. Calif. Pub. Utilities Comm'n*, 937 F.3d 1278, 1282 (9th Cir. 2019) (Nelson, J., concurring) (noting that before *Lujan*, standing was not seen as a preliminary or threshold question, and instead a plaintiff had a right to standing if correct on the merits that the provision in question protected its interests). That includes in the specific context of public school districts. *See Indian Oasis-Baboquivari Unified Sch. Dist. No. 40 v. Kirk*, 91 F.3d 1240, 1245, 1250 (9th Cir. 1996) (Reinhardt, J., dissenting), *vacated on reh'g en banc*, 109 F.3d 634 (9th Cir. 1997).

But the Ninth Circuit need not even do so. "[W]here intervening Supreme Court authority is clearly irreconcilable with our prior circuit authority, . . . district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled."

1  *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Supreme Court authority controls over

2  inconsistent Circuit precedent when "the reasoning or theory of our [Ninth Circuit] prior circuit authority

3  is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Coria v. Garland*,

4  96 F.4th 1192, 1195 (9th Cir. 2024). Thus, given the Supreme Court's development of this area of law that

5  conflicts with the Ninth Circuit, it would be appropriate to allow the LEA Plaintiffs to litigate this issue so

6  that, if it so desires, the en banc Ninth Circuit can take another look at whether to retain its rule barring

7  Supremacy Clause claims by political subdivisions. *See Va. Off. for Prot. & Advoc.*, 563 U.S. at 256

8  ("Although respondents argue that VOPA's status as a state agency changes the calculus, there is no

9  warrant in our cases for making the validity of an *Ex parte Young* action turn on the identity of the

10 plaintiff."); *Whole Woman's Health v. Jackson*, 595 U.S. 30, 53 (2021) (Thomas, J., concurring)

11 (discussing equitable doctrine of "negative injunction").

12      **D.  The Court has jurisdiction to hear Plaintiffs' claim for declaratory relief.**

13      Defendants claim that the Court lacks jurisdiction to hear CVUSD and AUHSD's claim for declaratory

14 relief, reasoning that it raises a question of only state law. Def. Mot. to Dismiss at.11:14. To the contrary,

15 however, the claim for declaratory relief directly raises questions of federal law.

16      In two of their claims, the District Plaintiffs seek declaratory and injunctive relief based on their

17 allegations that FERPA and the U.S. Constitution preempt AB 1955. But if the Court were to disagree on

18 those preemption questions, the District Plaintiffs ask in the alternative that the Court declare that Board

19 Policies 5010 and 5010.11 do not violate AB 1955 because they are consistent with the Constitution and

20 FERPA and are neutral on their face. The District Plaintiffs' claim for declaratory relief arises under federal

21 law because District Plaintiffs seek a ruling stating that their policies are constitutional and in line with

22 federal law, as discussed throughout this response. Because Plaintiffs' alternative claim for declaratory

23 relief asks the court to affirm that the Policies do not violate the Constitution or FERPA, it is not a novel

24 issue and is heavily intertwined with the case and controversy before the Court.

25      **E.  The Governor does not enjoy Eleventh Amendment immunity here because he has a "fairly direct" connection with the enforcement of AB 1955.**

26      The Eleventh Amendment generally shields states and state officials from suits brought by private

27

28 individuals in federal court. U.S. Const. amend. XIII, § 2. However, the *Ex parte Young* doctrine is a

---

20

judicially created exception to this immunity, allowing federal courts to grant prospective relief against state officials acting in their official capacities to prevent violations of federal law. This doctrine is rooted in the principle of a "need to promote the supremacy of federal law." *Ex parte Young*, 209 U.S. at 155-56 (1908).

*Ex parte Young* may apply when the state official has "some connection with the enforcement of the act." *Id.* at 157. The Ninth Circuit has specified that the connection "must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir.1992).

### i. *Ex parte Young* exception precedent permits Plaintiffs to sue state officials acting in their official capacity.

The Ninth Circuit has applied the *Ex parte Young* exception numerous times.  In *Los Angeles County Bar Ass'n v. Eu*, the court recognized that a Governor was a proper defendant under *Ex parte Young* because he had a "specific connection" to the statute in question through his "duty to appoint judges to any newly-created judicial positions." 979 F.2d at 704. In another Ninth Circuit case, the California Attorney General ("AG") was not immune under the Eleventh Amendment in a lawsuit raising a constitutional challenge to a state law banning the sale of foie. *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 941, 943 (9th Cir. 2013). The Ninth Circuit highlighted that the AG had a substantial connection to enforcing the ban under California Health & Safety Code § 25983, which granted prosecutorial authority to local district attorneys and city attorneys under the AG's supervision. *Id.* at 944. Furthermore, under the California Constitution, the AG has the duty to "direct supervision over every district attorney" and the authority to act as a district attorney when necessary. *Id.* Thus, the combination of supervisory duties and the explicit statutory enforcement authority constituted sufficient enforcement power to deny Eleventh Amendment immunity. *Id.*

When the governor has a specific role in enforcement that goes beyond general oversight, *Ex parte Young* applies. *See Duke Energy Trading and Marketing, L.L.C. v. Davis*, 267 F.3d 1042, 1052 (9th Cir. 2001) (holding that the Governor's "commandeering orders" invoked *Ex parte Young*). In *Artichoke Joe's v. Norton*, the Governor's "direct and substantial involvement" involvement in creating and

implementing tribal gaming compacts allowed *Ex parte Young* application. 216 F. Supp. 2d 1084, 1110 (E.D. Cal. 2002) (noting that the governor's role in compact negotiations, along with the authorization provided by California's Constitution to make these agreements tied him sufficiently to enforcement). "[W]here an official is specifically tasked with enforcing a statute that allegedly violates federal law, Eleventh Amendment immunity does not apply." *Id.* (citing *Ass'n des Eleveurs de Canards et d'Oies du Quebec*, 729 F.3d at 943).

In *Welchen v. Bonta*, the court found that the Attorney General had sufficient enforcement power where a criminal defendant challenged the bail schedule in Sacramento County on Fourteenth Amendment grounds. 630 F. Supp. 3d 1290, 1296 (E.D. Cal. 2022). The court held that "as the chief law enforcement officer, the Attorney General possesses the authority to supervise and direct law enforcement officers throughout the state, including actions involving enforcement of bail statutes." *Id.* at 1311. The court also highlighted that Cal. Gov't Code § 12550 gave the AG power to oversee investigations and enforce state laws, directly linking him to bail provisions. *Id.*

Finally, in *Sweat v. Hull*, the court found that Arizona Governor Hull had a sufficient connection to the enforcement of the law through her oversight of a specific Department, which she was empowered to direct under Arizona law. 200 F.Supp. 2d 1162, 1166–68 (D. Ariz. 2001) (stating "the governor shall appoint a director of environmental quality . . . [who] shall administer the department and serve at the pleasure of the governor."). The court concluded that the governor's responsibility to appoint and direct the ADEQ Director made her a proper party under *Ex parte Young*. *Id.* at 1167.

ii. **The California governor enjoys significant authority over State education.**

Here, Governor Newsom is an appropriate defendant under *Ex parte Young* because he holds both statutory and constitutional authority over California's education policy and enforcement. The State Board of Education, a constitutionally derived body comprised of 10 persons, is appointed by the Governor. Cal. Educ. Code § 33000 (West). And both Article IX, Section 7, of the California Constitution and the Education Code establish the State Board of Education as the governing and policy-determining body of the Department of Education. This Board wields significant power, as it is "responsible for setting California's academic standards, curriculum frameworks, instructional materials,

assessments, funding allocations, federal compliance, and accountability."[2] *See also State Bd. of Education v. Honig*, 13 Cal. App.4th 720, 766 (1993) (describing that the board "establish[es] goals affecting public education in California, principles to guide the operations of the Department, and approaches for achieving the stated goals.")

Governor Newsom's supervisory role is especially prevalent where California educational regulations intersect with federal mandates, such as FERPA. California law states that: "To the extent necessary to avoid a loss or delay of funds or services from the federal government that would otherwise be available to the state, The Governor may . . . [s]uspend, in whole or in part, any administrative adjudication provision of the Administrative Procedure Act [or] adopt a rule of procedure that will avoid the loss or delay[.]" 41A California Forms of Pleading and Practice--Annotated § 473.16 (2024). In addition, Governor Newsom holds statutory authority over the state education budget. He is required to submit a budget to the Legislature, which includes a detailed plan of proposed expenditures and estimated revenues for the ensuing fiscal year, "includ[ing] a section that specifies the percentages and amounts of General Fund revenues that must be set aside and applied for the support of school districts[.]" Cal. Gov't Code § 13337.

Finally, in *California School Boards Ass'n v. Brown*, the California Court of Appeals held that under the California Constitution, the governor has the power to exercise veto on reimbursements for mandates that impact school districts. 192 Cal. App. 4th 1507, 122 Cal. Rptr. 3d 674 (2011). The court highlighted that while the Legislature is required to appropriate funds or suspend mandates for each fiscal year, the governor can suspend a funding mandate and release school districts from implementing it. *Id.* at 1512–13.

### iii. Governor Newson has a "fairly direct" connection to the enforcement of AB 1955.

Similar to the governor's power to appoint judges in *Los Angeles County Bar Association*, Governor Newsom enjoys a "fairly direct" supervisory role based upon his appointment of the Board of Education and deputy superintendents. And Governor Newsom has a statutory duty to oversee budgetary decisions

---

[2] *See* The California Department of Education (CDE), https://www.ctc.ca.gov/credentials/assignment-resources/other-state-education-agencies.

and other aspects of state and federal law, and his regulatory responsibilities in ensuring compliance with federal education laws likewise amount to enforcement power. Moreover, as in *Artichoke Joe's v. Norton*, where the Governor's active involvement in negotiating and enforcing a tribal gaming compact was sufficient to establish enforcement authority, Governor Newsom's regulatory responsibilities in ensuring compliance with federal education laws likewise amount to enforcement power.

Additionally, as described in *Duke Energy Trading & Marketing, L.L.C. v. Davis*, where the Governor's commandeering of energy contracts constituted direct enforcement action, Governor Newsom's appointments and budgetary and policy directives create an enforcement connection—particularly where AB 1955 must align with federal law requirements. And akin to *Sweat v. Hull*, where the Arizona Governor's oversight of the Department of Environmental Quality and her duty to uphold federal law constituted an enforcement link, Governor Newsom's supervisory role over the State Board of Education and obligations to meet federal educational standards provide sufficient enforcement connection.

**II. Plaintiffs State Cognizable Claims as a Matter of Law.**

### A. Plaintiffs need not show that AB 1955 is invalid in every circumstance.

Defendants argue that Plaintiffs' facial challenge fails because they cannot prove that that AB 1955 is invalid in every circumstance, citing *United States v. Salerno*, 481 U.S. 739 (1987). Def. Mot. to Dismiss at 14:11. However, when applying *Salerno*, many courts, including the Supreme Court and Ninth Circuit, do not follow *Salerno* strictly and literally, recognizing that this would create absurd results. Indeed, in *City of Los Angeles v. Patel*, a city argued that a facial challenge to a regulation concerning Fourth Amendment searches and seizures "must fail because such searches will never be unconstitutional in all applications." 576 U.S. 409, 417 (2015). The Court found the logical outcome of strictly applying *Salerno* absurd, acknowledging that it would preclude facial relief to *every* Fourth Amendment challenge to a regulation authorizing warrantless searches. *Id.* at 17-18. Applying *Salerno* would, in effect, erase the Fourth Amendment because every search or seizure would be valid—the government only need produce a single hypothetical in which the search or seizure would be constitutional. The same absurd result applies to other areas of law as well. Justice Stevens noted in another case that he did "not believe the Court has

1    ever actually applied such a strict standard, even in *Salerno* itself," and did not appear to have done so in

2    the case at bar, either. *Washington v. Glucksberg*, 521 U.S. 702, 740 (1997) (Stevens, J., concurring).

3    Years later, Justice Thomas pointed out another test that *all agree* should be used: "While some

4    Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail

5    where the statute has a 'plainly legitimate sweep.'" *Wash. State Grange v. Wash. State Republican Party*,

6    552 U.S. 442, 449 (2008) (quoting *Glucksberg*, 521 U.S. at 740 (Stevens, J., concurring)). The Court then

7    added the *Washington State Grange* "plainly legitimate sweep" test to be used alongside *Salerno*, while

8    still not applying *Salerno* to its logical conclusion. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397

9    (2024) ("[A] plaintiff cannot succeed on a facial challenge unless he establish[es] that no set of

10   circumstances exists under which the [law] would be valid, or he shows that the law lacks a plainly

11   legitimate sweep." (cleaned up). The Ninth Circuit has followed the Supreme Court's lead here, noting the

12   *Salerno* standard but also articulating the *Washington State Grange* standard as an alternative. *Prison Legal*

13   *News v. Ryan*, 39 F.4th 1121, 1129 (9th Cir. 2022).

14   The *Salerno* standard is not strictly applied by the Supreme Court nor the Ninth Circuit because it

15   would doom virtually *every* facial challenge. Plaintiffs therefore need not prove that AB 1955 is invalid in

16   every circumstance, and their claim should not be dismissed.

17   **B.  Parents' Substantive Due Process Rights Include the right to be informed on their child's health and well-being at school.**

18

19   **i.   Parents have a right to control the upbringing of their children, including in the educational sphere.**

20   The Ninth Circuit recognizes that parental rights "extend beyond the threshold of the school door."

21   *Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187, 1190 (9th Cir. 2006) ("*Fields II*") (deleting contrary language

22   from *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197 (9th Cir. 2005) ("*Fields I*")); *Parents for Priv. v. Barr*,

23   949 F.3d 1210, 1230 n.15 (9th Cir. 2020). Although the Ninth Circuit has rejected attempts to modify

24   curriculum school-wide, the Ninth Circuit has affirmed that "[m]aking intimate decisions and controlling

25   the state's dissemination of information regarding intimate matters are two entirely different subjects," and

26   schools may "not interfere with the right of the parents to make intimate decisions." *Fields II*, 447 F.3d at

27   1191.

28

Parents have "the right of control" over their children. *Meyer*, 262 U.S. at 400. "Not only do parents have a constitutional right to exercise lawful control over the activities of their minor children, the law requires parents to do so." *Brekke v. Wills*, 125 Cal. App. 4th 1400, 1410 (2005). Fifty years ago, summarizing its conclusion from fifty years before then, the Supreme Court explained that "[t]he history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established *beyond debate* as an enduring American tradition." *Yoder*, 406 U.S. at 232 (emphasis added) (citing *Meyer*, 262 U.S. 390).

The right of parental control over children flows from concomitant responsibilities: "those who nurture [the child] and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Bellotti v. Baird*, 443 U.S. 622, 637 (1979) (plurality) (quoting *Pierce*, 268 U.S. at 535). "The duty to prepare the child for 'additional obligations,' referred to by the Court, must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." *Yoder*, 406 U.S. at 233. Control of "the child reside[s] first in the parents, whose *primary function and freedom* include preparation for obligations the state can *neither supply*," in light of the First Amendment, "nor hinder." *Prince v. Mass.*, 321 U.S. 158, 166 (1944) (emphasis added).

Preparing one's children for adulthood includes the right and duty to "direct the education of children." *Pierce*, 268 U.S. at 534. "Comprehensive and all-pervading as the police power is, there are certain rights and certain relations beyond its scope. One of these is the right of a parent to educate his own child in his own way." *Farrington v. Tokushige*, 11 F.2d 710, 714 (9th Cir. 1926). At the time of the ratification of the Fourteenth Amendment, "[t]he concept of total parental control over children's lives extended into the schools." *Brown*, 564 U.S. at 830 (Thomas, J., dissenting). "The history clearly shows a founding generation that believed parents to have complete authority over their minor children and expected parents to direct the development of those children. . . . Teachers and schools came under scrutiny, and children's reading material was carefully supervised." *Id.* at 834-35 (Thomas, J., dissenting).

Parental rights are not secondary to the desires of government agencies—children are "not the mere creature of the state." *Pierce*, 268 U.S. 510, 535 (1925). "Simply because the decision of a parent is not agreeable to a child, or because it involves risks, does not automatically transfer the power to make that

decision from the parents to some agency or officer of the state." *Parham v. J. R.*, 442 U.S. 584, 603 (1979). Nor are parental rights secondary to the desires of the child, because parents possess "broad parental authority over minor children. *Id.* at 602. Courts recognize that children often do not agree with parental decisions, but that does not change parental rights: "The fact that a child may balk at hospitalization or complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child." *Id.*

### ii. AB 1955 implicates parental rights related to medical care for their children.

The Fourteenth Amendment protects the right to refuse "unwanted lifesaving medical treatment," and the right "to bodily integrity." *Glucksberg*, 521 U.S. at 720 (citations omitted). This right protects against "'forced medical treatment' for the recipient's benefit." *Health Freedom Def. Fund, Inc. v. Carvalho*, 104 F.4th 715, 725 (9th Cir. 2024).

With respect to the medical care of children, the Constitution "permit[s] the parents to retain a substantial, if not the dominant, role in the decision." *Parham*, 442 U.S. at 604. This right includes both "the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). Indeed, because of youthful impetuosity, "children rely on parents or other surrogates to provide informed permission for medical procedures that are essential for their care." *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018) (quotations omitted). "Children, by definition, are not assumed to have the capacity to take care of themselves." *Schall v. Martin*, 467 U.S. 253, 265 (1984) (cleaned up).

The World Professional Association for Transgender Health ("WPATH") describes itself as a non-profit, interdisciplinary professional and educational organization devoted to transgender health. Compl. ¶ 34. WPATH recognizes that social transitions implicate both mental and physical health. Indeed, WPATH recommends that mental health providers "should provide guidance *to parents/caregivers* and supports to a child when a social gender transition is being considered" and to "facilitate the parents/caregivers' success in making informed decisions about the advisability and/or parameters of a social transition for their child." *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*,

WPATH, International J. Trans. Health 2022, Vol. 23, No. S1, S1–S258 (2022),[3] at S78. WPATH recognizes that "social transition for children typically can only take place with the support and acceptance of parents/caregivers." *Id.* at S77. As WPATH recognizes, Health does not include only physical interventions—it encompasses the whole body, including, and very importantly, mental health, in which parents should be crucially involved.[4]

As a court in this Circuit has recently recognized, socially transitioning children from one gender to another involves the health of children: A "policy of elevating a child's gender-related choices to that of paramount importance, while excluding a parent from knowing of, or participating in, that kind of choice, is as foreign to federal constitutional and statutory law as it is *medically* unwise." *Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1212 (S.D. Cal. 2023) (emphasis added).

The rights of parents in this instance are so fundamental that no application of any specific test has been needed for at least three courts to conclude that parental rights include the right to both notice and consent regarding a child's social transition. *T.F. v. Kettle Moraine Sch. Dist.*, No. 21-cv-1650 (Wis. Cir. Ct., Waukesha Cnty., Oct. 3, 2023); *Tenn. v. Cardona*, No. 2:24-cv-72, 2024 WL 3019146, at *30-31 (E.D. Ky. June 17, 2024); *Ricard v. Geary Cnty. Unified Sch. Dist. 475*, No. 5:22-cv-4015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022) (discussing parental right to "contest[] the use of pronouns for their child"). Two other courts have held that parents at least have the right to not be lied to. *Willey v. Sweetwater Cnty. Sch. Dist. No. 1*, 680 F. Supp. 3d 1250, 1279-80 (D. Wyo. 2023); *Doe v. Madison Metro. Sch. Dist.*, No. 20-cv-454 (Wis. Cir. Ct., Dane Cnty., Sep. 28, 2020).

### C. Strict scrutiny applies here because AB 1955 infringes on Parent Plaintiffs' fundamental right to direct the upbringing of their children.

Parents have a fundamental liberty interest in directing the upbring of their children; indeed, "the interest of parents in the care, custody, and control of their children[] is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, U.S. at 65. "It is cardinal" that

---

[3] *Available at* https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("WPATH SOC8").

[4] This is especially true considering the intimate connection between gender dysphoria and mental health. Children who express a gender identity inconsistent from their sex are frequently diagnosed with serious comorbidities, including mental developmental disabilities, autism, and prior psychiatric illness. A recent study reported that 87.7% of children and adolescents diagnosed with gender dysphoria had comorbid psychiatric diagnoses, and many had a "history of self-harm, suicidal ideation, or symptoms of distress." Kasia Kozlowska, et al., Attachment Patterns in Children and Adolescents With Gender Dysphoria, 11 Front Psychol. 1, 1 (Jan. 12, 2021), https://www.frontiersin.org/ articles/10.3389/fpsyg.2020.582688/full.

"the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.* at 65-66 (quoting *Prince v. Massachusetts*, 321 U.S. at 166). "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Yoder*, 406 U.S. at 232. Again and again, the Supreme Court has affirmed the "fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66 (listing cases).

The Ninth Circuit confirms that parents have "a fundamental right to decide *whether* to send their child to a public school." *Fields I*, 427 F.3d at 1206. And parental rights with respect to public education "extend beyond the threshold of the school door." *Fields II*, 447 F.3d at 1190-91; *accord Hardwick v. Bd. of Sch. Trustees*, 54 Cal. App. 696, 714 (1921).

When the government infringes on a fundamental right such as this, strict scrutiny applies. *See Glucksberg*, 521 U.S. at 721. Compelling Parent Plaintiffs to allow California school districts to socially transition their children to a new gender without their knowledge or involvement, or withdraw their children from California public schools, violates Parent Plaintiffs' fundamental rights to direct the upbringing of their children. Because AB 1955 infringes on Parent Plaintiffs' fundamental rights to direct the upbringing of their children, the Defendants must meet strict scrutiny. While Defendants may have an interest in protecting transgender youth from discrimination, they do not have a compelling interest in attempting to do so through deceiving parents about their children because "there is a presumption that fit parents act in the best interests of their children." *Troxel*, 530 U.S. at 68.

### D. Parent Plaintiffs Have Stated a Viable Free Exercise Claim Because the Act is Not Neutral and Generally Applicable, and Does Not Meet the Least Restrictive Means Test.

Under the Free Exercise Clause, if "challenged restrictions are not neutral and of general applicability, they must satisfy strict scrutiny, and this means that they must be narrowly tailored to serve a compelling state interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. at 18 (cleaned up). Where a regulation "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions," it is not generally applicable. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th at 686 (quoting *Fulton v. City of Philadelphia*, 593 U.S. at 533). The discretion need not be "unfettered," *id.* at 687; strict scrutiny is triggered anytime a regulation "invites the government

to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 593 U.S. at 537 (cleaned up).

Here, Parent Plaintiffs are devout Christians who believe God created man and woman as distinct, immutable genders, and their religious beliefs require that they be notified if their child requests to socially transition at school so that they may be involved with their child's treatment at school. Compl. ¶ 75. Compelling Parent Plaintiffs to allow California school districts to socially transition their children to a new gender without their knowledge or involvement, or else withdraw their children from California public schools, is a substantial burden on Parent Plaintiffs' free exercise of religion. "Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas v. Review Bd. of Ind.*, 450 U.S. 707, 717-18 (1981); see also *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) ("[T]he Free Exercise Clause protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.") (quotations omitted); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.") Here, being subject to AB 1955 is a condition of receiving a free public education for Parent Plaintiffs, constituting a severe burden. *See Mirabelli*, 691 F. Supp. 3d at 1222.

The existence of secular exemptions from government-created burdens, without offering a religious exemption, triggers strict scrutiny if the secular exemptions undermine the government's interests "in a similar or greater degree" than a religious exemption would. *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 542-43 (1993); *accord Fulton*, 593 U.S. at 534. Stated differently, government actions are not generally applicable "whenever they treat any comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. In that context, there is no need to assess "whether a law reflects 'subtle departures from neutrality,' 'religious gerrymander[ing],' or 'impermissible targeting' of

religion." *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021) (Statement of Gorsuch, J.) (quoting *Lukumi*, 508 U.S. at 534-35) (cleaned up).[5]

"[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022) (quoting *Tandon*, 593 U.S. at 62). And "[g]eneral applicability requires, among other things, that the laws be enforced evenhandedly." *Id.* Thus, for example, if the government's interest is "health and safety," then it can grant solely medical exemptions to vaccine mandates, and not religious exemptions. But if that were its asserted interest, it could not grant exemptions for its own administrative needs while denying religious exemptions. *Bacon v. Woodward*, 104 F.4th 744, 752 (9th Cir. 2024).

Defendants themselves state that AB 1955 "does not bar" disclosure in "every circumstance." Def. Mot. to Dismiss at 4:24. They declare that AB 1955 "specifically allows for *mandatory* disclosure of information when the student consents or when 'required by state or federal law,' such as if disclosure to parents is required by the Family Educational Rights Privacy Act (FERPA) or California law. Def. Mot. to Dismiss at 4:25-27.[6]

What's more, Defendants also point to the ability of districts to "adopt nuanced policies that allow— but do not mandate—disclosure in certain circumstances[.]" Def. Mot. to Dismiss at 5:2-3. These discretionary exemptions invite government agencies to allow disclosure in presumptively secular circumstances but not religious. Because these discretionary exemptions exist and the same privilege is not given to potential religious exemptions, AB 1955 is not generally applicable and strict scrutiny is triggered.

Strict scrutiny is "the most demanding test known to constitutional law." *Boerne v. Flores*, 521 U.S. 507, 534 (1997). "The whole point of strict scrutiny is to test the government's assertions, and our

---

[5] The reasoning in Justice Gorsuch's statement was joined by four other Justices, making it a binding opinion. See *Tandon v. Newsom*, 593 U.S. at 63 (citing Justice Gorsuch's statement and Justice Barrett's concurrence as together binding authority).

[6] Further, under California law, parents have the right to "observe the classroom or classrooms in which their child is enrolled" and the right to "provid[e] assistance in the classroom with the approval, and under the direct supervision, of the teacher." Cal. Educ. Code § 51101(a)(1), (3). And under both FERPA (discussed below) and California law, parents have the right "[t]o have access to the school records of their child." Cal. Educ. Code § 51101(a)(10). If a parent requested to sit in at class, or to review their child's gender-related records, then attempts to deceive him about his child's gender presentation at school would become moot. These comparable exemptions trigger strict scrutiny. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th at 688 ("regulations are not neutral and generally applicable ... whenever they treat *any* comparable secular activity more favorably than religious exercise.") (quoting *Tandon v. Newsom*, 593 U.S. at 62) (original emphasis).

precedents make plain that it has always been a demanding and rarely satisfied standard." *S. Bay United Pentecostal Church*, 141 S. Ct. at 718 (Statement of Gorsuch, J.).

As discussed above, the government does not have a compelling interest in creating a "safe" environment through the deception of parents, because "there is a presumption that fit parents act in the best interests of their children." *Troxel*, 530 U.S. at 68. Defendants have no compelling interest in enforcing AB 1955 to comply with California or federal law because AB 1955 is not required by California or federal law, or—if required by California law—is superseded by federal law. Defendants have no legitimate, let alone compelling, interest in requiring parents to adhere to the State's own ideological beliefs on a controversial matter of public debate because a policy "'aim[ed] at the suppression' of views" is flatly prohibited. *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019). This "lie[s] beyond the government's power," even when the goal is "[a]s compelling as the interest in preventing discriminatory conduct." *Green v. Miss United States of Am.*, LLC, 52 F.4th 773, 784, 792 (9th Cir. 2022).

AB 1955 is also not the least restrictive means of achieving Defendants' stated interest. The "least-restrictive-means standard is exceptionally demanding" in that it requires the government to show that "it lacks other means of achieving its desired goal." *Burwell v. Hobby Lobby Stores*, Inc., 573 U.S. 682, 728 (2014). Keeping critical information about a child from their parents is an extreme measure, and certainly not the least restrictive.

Regardless, the court need not resolve the merits at this stage. Motions to dismiss do not involve evaluating the substantive merits of the claims. *Cervantes v. City of San Diego*, 5 F.3d 1273, 1276 (9th Cir. 1993). It is enough that Plaintiffs have alleged the elements of a claim and defendants have not met their burden—this standard is viewed liberally in favor of plaintiffs. *Id.* at 1275.

### E. FERPA preempts AB 1955.

In addition, AB 1955 is unconstitutional because FERPA preempts it. Federal law preempts state law when it is impossible to comply with both federal and state laws, or when state law stands as an obstacle to the accomplishment of federal objectives. Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Thus, since the Supreme Court's decision in

*M'Culloch v. Maryland,* 17 U.S. at 427, it has been settled that state law that conflicts with federal law is "without effect." *Cipollone*, 505 U.S. at 516.

In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law, *see Pacific Gas & Elec. Co,* 461 U.S. at 204, or if federal law so thoroughly occupies a legislative field "'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Fidelity Fed. Sav. & Loan Assn.*, 458 U.S. at 153.

FERPA governs communications between a school and the parents of a student regarding that student's education and education records. Compl. ¶ 80; 20 U.S.C. § 1232g. FERPA defines "education records" as documents that "contain information directly related to a student" and "are maintained by an educational agency or institution." Compl. ¶ 81; 20 U.S.C. § 1232g(a)(4)(A). Schools that receive federal funds must guarantee parental access to student education records and the ability to contest and correct errors within those records. Compl. ¶ 82; 20 U.S.C. § 1232g(a)(2); *Owasso Indept. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. at 435.

FERPA preempts AB 1955 because any record created by a school pertaining to a child's gender "transition" would necessarily be a record that "contain[s] information directly related to a student" and is "maintained by an educational agency" and therefore falls within the coverage of FERPA. Compl. ¶ 83. FERPA requires that these records be accessible to parents. *See Ricard v. Geary Cnty. Unified Sch. Dist. 475*, 2022 WL 1471372, at *7 (in addressing similar policy, noting that FERPA requires that parents have access to all school records about their children). AB 1955 commands school districts to do the exact opposite and only release such information with the consent of the child.

Therefore, the Court should deny Defendants' motion to dismiss with respect to Plaintiffs' FERPA preemption claim.

## CONCLUSION

For these reasons, Plaintiffs respectfully ask the Court to deny Defendants' Motion to Dismiss.

Respectfully Submitted,

1    Dated: November 8, 2024                    LIBERTY JUSTICE CENTER

2

3

4                                              By:  *Emily Rae*

5                                                   _____
                                                    Emily Rae

6                                                   Attorney for Plaintiffs

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS (2:24-CV-01941-DJC-JDP)