1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   CHINO VALLEY UNIFIED SCHOOL            2:24-cv-01941-DJC-JDP
     DISTRICT, a local educational agency;
12   ANDERSON UNION HIGH SCHOOL
     DISTRICT, a local educational agency;
13   ORANGE COUNTY BOARD OF               **<u>ORDER</u>**
     EDUCATION, a local educational
14   agency; OSCAR AVILA, an individual;
     MONICA BOTTS, an individual;
15   JASON CRAIG, an individual; KRISTI
     HAYS, an individual; COLE MANN, an
16   individual; VICTOR ROMERO, an
     individual; GHEORGHE ROSCA,
17   JR., an individual; and LESLIE
     SAWYER, an individual;
18
                    Plaintiff,
19
          v.
20
     GAVIN NEWSOM, in his official
21   capacity as Governor of the State of
     California; ROBERT BONTA, in his
22   official capacity as Attorney General of
     the State of California; and TONY
23   THURMOND, in his official capacity as
     California State Superintendent of
24   Public Instruction;
25
                    Defendants.
26

27

28

                              1

**INTRODUCTION**

Confronting various forms of discrimination against lesbian, gay, bisexual, transgender, queer, and questioning youth, the California State Legislature enacted Assembly Bill 1955 which, among other things, prohibits California public schools from disclosing to parents instances in which a parent's child goes by a different name or gender pronoun at school.  Plaintiffs – a group of parents and several school entities – challenge Assembly Bill 1955, arguing that it unduly restricts parents' ability to gain information about their children's gender identity or gender expression at school in violation of the First Amendment.  However, the Court concludes that the Parent Plaintiffs have failed to allege that they themselves will be injured, and so there is no Article III standing for their lawsuit to be heard in federal court.  Specifically, the Plaintiff Parents have not indicated that their children have changed or are likely to change their gender identity or gender expression, meaning that there is no reason to think that Assembly Bill 1955 has impacted or will impact their access to information about their children.  Moreover, public school entities are barred from challenging state law on constitutional grounds in federal court, such that the School Entity Plaintiffs' claims also cannot proceed.  While Plaintiff Parents will be granted the ability to amend their Complaint, as currently stated this Court lacks jurisdiction to hear their suit.

**BACKGROUND**

The California State Legislature has determined there is a crisis of bullying, harassment, and discrimination against transgender and gender-nonconforming youth.  *See, e.g.*, *Hearing on A.B. 1955 Before the A. Comm. on Educ.*, June 26, 2024 (Cal. 2024)[1] at 6–7 (identifying and discussing data on discrimination against transgender and gender nonconforming youth), hereinafter "Hearing Notes").  In response to this pressing societal concern, the California Legislature passed, and

---

[1] Available at https://aedn.assembly.ca.gov/system/files/2024-06/ab-1955_2.pdf (last accessed April 17, 2025.)

2

1  Governor Gavin Newsom signed, Support Academic Futures and Educators for

2  Today's Youth Act ("AB 1955" or "Act").  (ECF No. 14, hereinafter "FAC" ¶ 25.)  AB

3  1955 makes two notable changes to the California Education Code: First, it requires

4  the California Department of Education to create resources to assist parents and

5  schools in creating supportive environments for lesbian, gay, bisexual, transgender,

6  queer and questioning (LGBTQ) students.  Cal. Educ. Code § 217.  Second, it

7  prohibits California public schools from adopting or enforcing policies that mandate

8  disclosure of a student's sexual orientation, gender identity, or gender expression to

9  any third party (including parents) without that child's permission.  *Id*. § 220.5; *see id*.

10  § 220.3.  AB 1955 is aimed at protecting the privacy of a student's decision to go by a

11  different name or to be identified as a different gender, steps which are often referred

12  to as a social transition.  *See* Cal. Educ. Code §§ 220.1, 220.3, 220.5; *see also* Hearing

13  Notes.  These policies are intended to prevent the "forced outing" of a student by

14  school staff, thereby protecting that student's ability to come out as transgender or

15  gender nonconforming to their family when they feel safe and ready to do so.  *See*

16  Hearing Notes at 8.  AB 1955 took effect on January 1, 2025.  (FAC ¶ 25.)

17      The Plaintiffs in this case consist of several entities: (1) a group of parents

18  ("Parent Plaintiffs") who have children enrolled in California public schools and who

19  are "devout Christians and believe that God created man and woman as distinct,

20  immutable genders" (*id*. ¶¶ 13–21); and (2) Chino Valley Unified School District

21  ("CVUSD"), Anderson Union High School District ("AUHSD"), and Orange County

22  Board of Education ("OCBE"; collectively "LEA Plaintiffs"), all of which are California

23  local educational agencies (LEAs) as defined by California Education Code section

24  56026.3 (*id*. ¶¶ 10–12).  Plaintiffs, concerned with the potential application of AB 1955

25  on their students, now bring a facial challenge to the Act, alleging that it: (1) interferes

26  with a parent's fundamental right to control the upbringing and medical care for their

27  children under the Fourteenth Amendment; (2) restricts the parents' First Amendment

28  right to practice their religion; and (3) that AB 1955 is displaced by the Family

1  Educational Rights and Privacy Act ("FERPA"), and therefore, is unenforceable under

2  the Supremacy Clause of the United States Constitution (U.S. Const., art. IV, cl. 2).  (*Id.*

3  ¶¶ 65–96.)  Defendants are Governor Newsom, Attorney General of California Robert

4  Bonta, and California State Superintendent of Public Instruction Tony Thurmond, all of

5  whom are sued in their official capacity.

6  **LEGAL STANDARD**

7  A party may move to dismiss a complaint for "lack of subject matter jurisdiction"

8  under Federal Rule of Civil Procedure 12(b)(1).  Challenges to a plaintiff's Article III

9  standing are properly raised under a 12(b)(1) motion, as standing is required for a

10  federal court to exercise jurisdiction.  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598

11  F.3d 1115, 1122 (9th Cir. 2010); *see Nat'l Fed'n of the Blind of Cal. v. Uber Techs., Inc.*,

12  103 F. Supp. 3d 1073, 1078 (N.D. Cal. 2015).  Taking the allegations in the complaint

13  as true, "the court must determine whether a lack of federal jurisdiction appears from

14  the face of the complaint itself."  *Nat'l Fed'n of the Blind of Cal.*, 103 F. Supp. 3d at

15  1078.  "[The] party invoking the federal court's jurisdiction has the burden of proving

16  the actual existence of subject matter jurisdiction."  *Thompson v. McCombe*, 99 F.3d

17  352, 353 (9th Cir. 1996); *Chandler*, 598 F.3d at 1122.

18  Standing under Article III of the U.S. Constitution has three basic elements: the

19  Plaintiff must have suffered: (1) an "injury in fact"; (2) which is fairly traceable to or

20  caused by the defendant's offensive conduct; and (3) which is likely to be redressed

21  by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  The

22  injury in fact element is satisfied by showing that the injury is both (a) concrete and

23  particularized and (b) actual or – where a plaintiff seeks injunctive relief – imminent.

24  *Lujan*, 504 U.S. at 564; *see City of L.A. v. Lyons*, 461 U.S. 95, 102 (1983).

25  **DISCUSSION**

26  Plaintiff Parents are unable to satisfy the injury element of Article III standing

27  and are therefore unable to bring this suit in federal court.  Separately, LEA Plaintiffs,

28  as political subdivisions of the state of California, are barred from challenging state

4

1   law on constitutional grounds in federal court.  Governor Newsom is not a proper

2   defendant here because, as Governor, he is entitled to immunity under the Eleventh

3   Amendment of the U.S. Constitution.  Finally, FERPA and AB 1955 do not require

4   conflicting actions on the part of schools, and thus, federalism principles that would

5   displace AB 1955 are not implicated.  Finding that there is no standing to bring these

6   claims, the Court does not reach the merits of Plaintiffs' arguments that AB 1955 is

7   otherwise unconstitutional.

### I.   Plaintiff Parents Are Unable to Satisfy the Injury Element of Article III Standing

10       An inquiry into whether a plaintiff has standing to sue in federal court under

11   Article III is "the threshold question" that a court must assess.  *Food & Drug Admin. v.*

12   *All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024).  That is, a plaintiff must

13   demonstrate that they have suffered: (1) an injury in fact; (2) that is traceable to or

14   caused by the defendants' offensive conduct; and (3) that can likely be redressed by a

15   favorable judicial decision.  *Lujan*, 504 U.S. at 560–61.  At issue here is whether

16   Plaintiffs have suffered an injury-in-fact, which requires "'an invasion of a legally

17   protected interest' that is 'concrete and particularized' and 'actual or imminent, not

18   conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting

19   *Lujan*, 504 U.S. at 560).  To be concrete, the injury "must be de facto; that is, it must

20   actually exist."  *Id.* at 340 (internal quotations omitted).  "For an injury to be

21   'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 339

22   (quoting *Lujan*, 504 U.S. at 560 n.1).

23       Here, the Court's inquiry into standing begins and ends with an assessment of

24   whether Plaintiff Parents have suffered an injury in fact.  While the Court has no doubt

25   as to the concern that Plaintiff Parents have toward the implementation of AB 1955,

26   Plaintiff Parents have not shown that they have suffered or will imminently suffer any

27   form of harm as a result the Act.  For example, Plaintiff Parents do not allege that their

28   own child has gone or goes by a different name at school, that their children's school

1    has deprived the parents of relevant information about their child, or that this is

2    something that is likely to happen in the future.  (*See* FAC ¶¶ 13–21.)  Instead, Plaintiff

3    Parents merely allege that they are parents "who believe[] God created man and

4    woman as distinct, immutable genders," who "object[] on both conscience and

5    religious ground to their public schools withholding information about changes to

6    their child's gender identity from them"  (*Id.*)  There is otherwise no indication that AB

7    1955 has been applied to their students.

8    　　　*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), a seminal case on

9    Article III standing, provides the framework for analyzing Plaintiff Parents' standing.  In

10   *Clapper*, a group of attorneys and human rights workers sued to invalidate the

11   Foreign Intelligence Surveillance Act ("FISA"), a statute that permits the government to

12   surveil certain foreign entities.  *Id.* at 401, 406.  The plaintiffs alleged that their human

13   rights work required them to communicate with entities likely under U.S. surveillance,

14   exposing the group's sensitive and privileged discussions to the government.  *Id.* at

15   406–07.  On review, the Supreme Court noted that plaintiffs could only "speculate and

16   make assumptions," *id.* at 411, as to whether the statute would apply to their

17   communications, falling far short of the constitutional requirement that the

18   "threatened injury must be certainly impending to constitute injury in fact," *id.* at 410

19   (quoting *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990)).  In other words, the plaintiffs'

20   claims relied on a hypothetical chain of facts, including that: (1) the federal

21   government would target communications with a person whom with the plaintiffs

22   communicated; (2) the federal government would invoke its authority to do so under

23   FISA; (3) that authority would be approved by the Foreign Intelligence Surveillance

24   Court; (4) the federal government would successfully obtain the communications; and

25   (5) the obtained communications would be those that involved the plaintiffs.  *Id.*  The

26   Supreme Court concluded that this sort of "speculative chain of possibilities does not

27   establish that injury based on potential future" harm, and held that the plaintiffs had

28   not sufficiently satisfied Article III's requirements for standing.  *Id.* at 414.  Moreover,

1  the Supreme Court rejected the argument that a failure to confer standing would

2  mean that the constitutionality of the statute could not be challenged, both because

3  "the assumption that if respondents have no standing to sue, no one would have

4  standing, is not a reason to find standing," and because alternate paths to challenging

5  the statute existed.  *Id*. at 421 (quoting *Valley Forge Christian College v. Americans*

6  *United for Separation of Church & State, Inc.*, 454 U.S. 464, 489 (1982).

7  　　　While the Ninth Circuit Court of Appeals has not yet weighed in on whether

8  parents, such as the Plaintiffs in this case, have standing to challenge a policy that has

9  not actually been applied to their children, several other Circuits, relying in part on

10  *Clapper*, have confronted similar fact patterns and have found that parents do not

11  have Article III standing.  *See Parents Protecting Our Child, UA v. Eau Claire Area Sch.*

12  *Dist., Wis.* ("*Parents Protecting Our Child*"), 95 F. 4th 501 (7th Cir. 2024), *cert. denied*,

13  145 S. Ct. 14 (2024); *see also John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*,

14  78 F. 4th 622 (4th Cir. 2023), *cert. denied sub nom. Jane Parents 1 v. Montgomery*

15  *Cnty. Bd. of Educ.*, 144 S. Ct. 2560 (2024).  While not binding on this Court, these

16  cases are instructive.

17  　　　In *Parents Protecting Our Child*, the Seventh Circuit affirmed a district court

18  order that found parents of students in public schools lacked Article III standing to

19  challenge a school policy that guided staff to obtain student permission before

20  disclosing a student's gender non-conformity or transgender identity with the

21  student's parent or guardian.  95 F. 4th at 503–05.  In that case, a school district policy

22  intended to "foster inclusive and welcoming environments" established "guidelines"

23  for schools to follow "to address the needs of transgender, nonbinary, and/or gender

24  non-conforming students."  *Id*. at 503.  The guidelines provided for the creation of a

25  student "Gender Support Plan" for certain students, which would be an official school

26  document available to parents on request.  *Id*. at 503–04.  The guidelines also

27  acknowledged that "some students might not [be] open at home for reasons that may

28  include safety concerns or lack of acceptance," and that "[s]chool personnel should

7

1   speak with the student first before discussing a student's gender non-conformity or

2   transgender status with the student's parent/guardian." *Id.* at 503.

3         Analyzing standing, the Seventh Circuit recognized the parents' legitimate

4   worries about being left "in the dark if their children wish to explore their gender

5   identity or begin to socially transition to a different gender at school" and the general

6   erosion of parents' roles in "making major life decisions for their children." *Id.* at 503–

7   04.  But, the court deemed that "expressions of worry and concern do not suffice to

8   show that any parent has experienced actual injury or faces any imminent harm

9   attributable" to the school policy.  *Id.* at 506 ("Our role is limited to awaiting concrete

10  disputes between adverse parties.").  For example, none of the parents had alleged

11  that their children had questioned their gender identity or otherwise sought support

12  or guidance under the school district's policy.  *Id.* at 504.  The Seventh Circuit

13  reasoned that, similar to the plaintiffs in *Clapper*, there was no indication that the

14  policy had or would apply to the parents' children, nor could the parents demonstrate

15  how the policy would concretely impact them or their children in a negative way in the

16  imminent future, and thus, there was no Article III standing.  *Id.* at 504–06 (affirming

17  the district court's finding that the alleged harm is "dependent on a 'chain of

18  possibilities' too speculative to establish Article III standing").

19        Here, as in *Clapper* and *Parents Protecting Our Child*, Plaintiff Parents are not

20  able to show injury beyond a speculative chain of events that have not yet, nor have

21  been imminently shown to, occur.  To find Article III standing for Plaintiff Parents'

22  claim, the Court would need to accept as true a series of hypothetical events,

23  specifically that: (1) a child of Plaintiff Parents is transgender or gender

24  nonconforming; (2) that student has informed a school staff member of their wishes to

25  be identified by a different name or pronoun; (3) that student did so without telling

26  their parent; and (4) that parent has been denied that information by the school.

27  Under *Clapper*, the Court is unable to do so.  *See Clapper*, 568 U.S. at 410–11.  Just

28  like the plaintiffs in *Parents Protecting Our Child*, Plaintiff Parents rely on the fear of a

1  policy that has not yet impacted or been shown to imminently impact their children.

2  Because Plaintiff Parents cannot demonstrate that there is any actual harm that would

3  occur, they cannot satisfy Article III's standing requirements.

4          It is true that several other federal courts have addressed similar policies and

5  found that the plaintiffs satisfied federal standing requirements, leading the courts to

6  reach the merits of the underlying dispute.  But those cases – *Mirabelli v. Olson*, 691 F.

7  Supp. 3d 1197 (S.D. Cal. 2023), *Regino v. Staley*, No. 23-16031, 2025 WL 1007045

8  (9th Cir. Apr. 4, 2025), *Foote v. Ludlow School Committee*, 128 F. 4th 336 (1st Cir.

9  2025), and *Littlejohn v. School Board of Leon County, Florida*, No. 23-10385, 2025 WL

10  785143 (11th Cir. Mar. 12, 2025) – are distinguishable from the case at hand.  In those

11  cases, the plaintiffs satisfied Article III standing requirements because the policy had

12  concretely affected them, either because they were teachers who had to comply with

13  the policy after a student started to socially transition at school or because they were

14  parents who were not informed by the school of their child's desire to socially

15  transition.

16          For example, in *Mirabelli*, the plaintiffs were teachers with religious beliefs that

17  "communications with a parent about a student should be accurate."  691 F. Supp. 3d

18  at 1203.  At the start of the school year, in compliance with a school policy that

19  prohibited staff from sharing a student's decision to go by a different gender identity

20  while at school, the plaintiff teachers "received emails from school staff with a list of

21  students with student-preferred names and pronouns."  *Id.* at 1205.  The circulated list

22  included at least one instruction to teachers to use a specific pupil's birth name when

23  calling home, which differed from the name and pronouns the student went by at

24  school.  *Id.*  The list further provided that the specified pupil's "[d]ad and stepmom are

25  NOT aware" that the pupil went by the different name and pronouns at school.  *Id.*  By

26  mandating school staff to follow the pupil's wishes regarding what name to be called,

27  the plaintiff teachers were required to comply, against their wishes, with the policy.  *Id.*

28  at 1205.  And in *Regino*, a case involving a comparable policy, the parent plaintiff's

child went by a different name at school, which was not disclosed to the child's mother.  No. 23-16031, 2025 WL 1007045, *3 (9th Cir. Apr. 4, 2025).  As in *Mirabelli*, the parent plaintiff had standing to bring the case in federal court because the school's policy had impeded her from receiving information about her child's gender identity.  *See id.*  In other words, in both *Mirabelli* and *Regino*, the school policy had actually been applied.  But here, Plaintiffs have not alleged that the policy has been invoked against any of their student children, nor is any plaintiff a teacher who has been forced to comply with AB 1955.

Two recent circuit court decisions involving similar policies that restrict a school staff member from informing a parent of a student's desire to go by a different name or pronoun are similarly distinguishable.  In both those cases, the parent plaintiffs had alleged that their own student had expressed interest in going by a different name or using different gender pronouns while at school.  *Foote*, 128 F. 4th at 341 (noting that the plaintiff's child was genderqueer and went by a different name and pronouns than those used at home with their parents); *Littlejohn*, 2025 WL 785143, at *1 (noting that the plaintiff's child asked to go by a different name and pronouns than those used at home with their parents).  As in *Mirabelli* and *Regino*, those cases differ from the one before the Court because Parent Plaintiffs here do not allege that their own child has acted in a way – i.e., requesting to by a different name or pronoun – that would implicate AB 1955's restriction on informing parents of their children's decision to use a different name or pronouns.  (*See* FAC ¶¶ 13–21.)

Plaintiff Parents are unable to show they have suffered an injury in fact, and therefore fail to satisfy the first element of Article III standing.  Accordingly, the Court cannot consider the merits of Plaintiff Parents' Fourteenth Amendment claim.

## II.    There is No Lesser Standing Requirement for Parents' Free Exercise Claims

Plaintiff Parents also bring a challenge under the Free Exercise Clause of the First Amendment against AB 1955, contending that the Act constricts the parents' free

1  exercise of religion.  (FAC ¶¶ 73–78; *see* ECF No. 24, Opposition, hereinafter "Opp'n,"

2  at 14–16.)  Specifically, they allege that AB 1955 allows schools to socially transition

3  their students, violating the parents' belief that "God created man and woman as

4  distinct, immutable genders."  (FAC ¶¶ 13–21.)  Plaintiff Parents argue that they have a

5  lower burden to meet Article III standing requirements for their Free Exercise claim.

6  (*See* Opp'n at 14, citing *Cal. Pro-Life Council, Inc. v. Getman* ("*Cal. Pro-Life Council*"),

7  328 F.3d 1088, 1094 (9th Cir. 2003) and *Ariz. Right to Life Pol. Action Comm. v.*

8  *Bayless* ("*Ariz. Right to Life*"), 320 F.3d 1002, 1006 (9th Cir. 2003).  As the Ninth Circuit

9  has observed "when the threatened enforcement effort [of an Act] implicates First

10  Amendment rights, the [Court's] inquiry tilts dramatically toward a finding of

11  standing."  *Ariz. Right to Life*, 320 F.3d 1002, 1006 (9th Cir. 2003) (internal quotations

12  omitted).  However, that line of cases is inapplicable here.

13      While it is true that "Constitutional challenges based on the First Amendment

14  present unique standing considerations," *id.*, that rule has only been applied in the

15  context of the Free Speech Clause.[2]  *See Cal. Pro-Life Council*, 328 F.3d at 1094

16  ("*Particularly in the First Amendment-protected speech context*, the Supreme Court

17  has dispensed with rigid standing requirements.") (emphasis added); *see also Ariz.*

18  *Right to Life*, 320 F.3d at 1006 (discussing First Amendment freedom of speech cases).

19  Indeed, the rationale underlying this relaxed standing requirement is specific to a

20  longstanding desire to avoid chilling protected speech.  "In an effort to avoid the

21  chilling effect of sweeping restrictions, the Supreme Court has endorsed what might

22  be called a 'hold your tongue and challenge now' approach rather than requiring

23  litigants to speak first and take their chances with the consequences."  *Cal. Pro-Life*

24  *Council*, 328 F.3d at 1094 (quoting *Ariz. Right to Life*, 320 F.3d at 1006.).  Plaintiffs

25  point to no caselaw extending this line of cases into the Free Exercise context, and the

26

27  ───────────────
[2] The parties were given leave to submit additional authority on this issue.  (ECF No. 29.)  Plaintiffs did
not provide any additional authority to support their assertion that there is a preference in favor of
28  standing for First Amendment religious practice claims.

11

1    Court declines the invitation to relax traditional Article III standards in this context.

2         Even if the Court were to turn to the cases cited by Plaintiff Parents to extract an

3    applicable lower bar to First Amendment Free Exercise claims, those cases do not

4    provide any standard that would help Plaintiff Parents here.  (*See* Opp'n at 14.)  For

5    example, in *California Pro-Life Council, Inc. v. Getman*, the Ninth Circuit reaffirmed that

6    a party – in a First Amendment Free Speech context – could establish standing to

7    challenge a proscriptive policy if that party faced a "genuine threat of imminent

8    prosecution."  328 F.3d at 1094, quoting *Thomas v. Anchorage Equal Rights Comm'n*,

9    220 F.3d 1134, 1138 (9th Cir. 2000).  To demonstrate a threat of imminent

10   prosecution, a party could point to whether it had a concrete plan to violate the

11   statute in question, whether the prosecuting authorities had previously communicated

12   a warning to initiate proceedings against the party, or a history of past prosecution or

13   enforcement under the challenged statute.  *Id.*  But if the Court were to use that test

14   here, Plaintiff would not be able to demonstrate that any of those factors applied.  It is

15   not possible for Plaintiff Parents to violate AB 1955 because it is applied by school

16   administrators, rather than parents.  Nor have Plaintiff Parents pointed to any threat of

17   proceedings against them or a past history of prosecution.

18        Similarly, *Arizona Right to Life Political Action Committee v. Bayless*, 320 F.3d

19   1002 (9th Cir. 2003) – another First Amendment Speech case relied on by Plaintiff

20   Parents – does not provide any basis for standing here.  In that case, the Ninth Circuit

21   held that a party could satisfy standing requirements to challenge a policy or statute

22   restricting speech if the party could show that it intended to engage in a course of

23   conduct that would implicate the restrictive policy and that there was a credible threat

24   of the challenged provision being invoked in response.  *Ariz. Right to Life*, 320 F.3d at

25   1006.  But again, Plaintiff Parents are not able to violate AB 1955, nor have they

26   identified the possibility of any form of proceedings being initiated against them

27   under the statute.

28        In other words, even if the Court were to apply the cases relied on by Plaintiff

1    Parents – and to be clear, the Court does not believe that those cases apply – Plaintiff

2    Parents would still lack standing to bring their claims in federal court.

3    **III.    LEA Plaintiffs Lack Standing Because They Are Political Subdivisions of**

4          **the State**

5         Political subdivisions of a state lack standing to challenge state law on federal

6    constitutional grounds.  *City of San Juan Capistrano v. Cal. Pub. Util. Comm'n*, 937

7    F.3d 1278, 1280 (9th Cir. 2019).  California public school districts (e.g., CVUSD and

8    AHUSD), county offices of education, and local boards of education (e.g., OCBE) are

9    political subdivisions of the state for purposes of assessing standing to sue against the

10    state.  *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 934 (9th Cir. 2017).

11         LEA Plaintiffs are California public school districts and a local board of

12    education.  They seek, separate from Plaintiff Parents, to sue California state officials in

13    their official capacity, to enjoin the implementation of a state law on federal

14    constitutional grounds.  Binding Ninth Circuit precedent clearly dictates they cannot

15    do so.  *See San Juan Capistrano v. Cal. Pub. Util. Comm'n*, 937 F.3d at 1280, n.1 (9th

16    Cir. 2019) ("We have held that . . . a school district [] lack[s] standing to sue various

17    state officials.").  In light of controlling Ninth Circuit case law restricting the very types

18    of claims LEA Plaintiffs seek to advance, LEA Plaintiffs' claims cannot move forward.

19    **IV.    Governor Newsom is Entitled to Eleventh Amendment Immunity**

20         Under the Eleventh Amendment and broader notions of sovereign immunity,

21    states and state agencies are immune from suit in federal court.  *Brooks v. Sulphur*

22    *Springs Valley Elec. Co-op.,* 951 F.2d 1050, 1053 (9th Cir. 1991).  An exception to this

23    principle is the *Ex parte Young* doctrine, which allows suits for prospective relief

24    against state officials acting in their official capacity if the official has "some

25    connection" to the alleged injury.  *Mecinas v. Hobbs*, 30 F. 4th 890, 903 (9th Cir.

26    2022) (internal quotations omitted).  The connection must extend beyond a merely

27    "supervisory" role and should be "fairly direct."  *Snoek v. Brussa,* 153 F.3d 984, 986

28    (9th Cir. 1998).

1    Plaintiffs allege that Governor Newsom "enjoys significant authority over State
2    education." (Opp'n at 22.)  Plaintiffs point out that Governor Newsom appoints
3    members of the State Board of Education, which is responsible for setting state
4    academic standards, curriculum frameworks, instructional materials, assessments,
5    funding allocations, federal compliance, and accountability. *(Id.* at 22–23.)  But
6    appointment of State Board of Education members is not a "fairly direct" role; Plaintiffs
7    have not shown, or even alleged, that Governor Newsom directs State Board
8    members in a way connected to Plaintiffs' alleged injury.  For example, they have not
9    indicated that Board members follow Governor Newsom's orders, or that Board
10   members are bound to a specific policy platform created by the Governor.  Because
11   Plaintiffs have not substantiated a fairly direct connection between Governor Newsom
12   and AB 1955, their argument that he lacks Eleventh Amendment immunity fails, and
13   he must be dismissed as a defendant.  *See Ass'n des Eleveurs de Canards et d'Oies du*
14   *Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (a governor's general duty to
15   enforce California law does not dissolve his immunity under the Eleventh
16   Amendment).

17   **V.     AB 1955 and FERPA Do Not Conflict**

18   FERPA guarantees the rights of parents to "inspect and review" their child's
19   education records.  20 U.S.C. § 1232g(a)(1)(A).  As relevant here, AB 1955 prohibits
20   public schools from adopting or enforcing policies that mandate disclosure of a
21   student's sexual orientation, gender identity, or gender expression to any third party
22   (including parents) without that child's permission.  Cal. Educ. Code § 220.5; *see id.*
23   § 220.3.

24   Plaintiffs allege that FERPA and AB 1955 are in conflict because FERPA requires
25   that any school record pertaining to a child's gender would need to be viewable by
26   parents upon request.  (FAC ¶¶ 79–86; Opp'n at 32–33.)  This argument fails.  AB 1955
27   has an explicit carveout for any conflict with federal law (i.e., FERPA).  The text of both
28   California Education Code sections 220.3 and 220.5 dictates that the statutes apply

14

1   "*unless* otherwise required by state or *federal law*." Cal. Educ. Code § 220.3(a);

2   (emphasis added); *id.* § 220.5(a) (emphasis added).  Because FERPA and AB 1955 do

3   not conflict, AB 1955 is not preempted under principles of federalism.  *See CDK Glob.*

4   *LLC v. Brnovich*, 16 F. 4th 1266, 1274 (9th Cir. 2021) ("In the absence of

5   irreconcilability between state and federal law, there is no conflict preemption")

6   (internal quotations omitted).

7   **VI.    Leave to Amend**

8          A court granting a motion to dismiss a claim must decide whether to grant

9   leave to amend.  Leave to amend should be "freely given" where there is no "undue

10  delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to

11  the opposing party by virtue of allowance of the amendment, [or] futility of [the]

12  amendment . . . ."  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Eminence Cap., LLC v.*

13  *Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (listing the *Foman* factors as those to

14  be considered when deciding whether to grant leave to amend).  But, dismissal

15  without leave to amend may be proper if it is clear that the complaint could not be

16  saved by any amendment.  *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048,

17  1056 (9th Cir. 2007; *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir.

18  1989) ("Leave need not be granted where the amendment of the complaint . . .

19  constitutes an exercise in futility . . . .")).

20         Here, the Court finds that it may be possible for Parent Plaintiffs to allege

21  sufficient facts to establish Article III standing, and allowing Parent Plaintiffs an

22  opportunity to amend at this early stage of the litigation would not be prejudicial to

23  Defendants.  However, the Court also concludes that LEA Plaintiffs' standing defects

24  cannot be cured by amendment because controlling caselaw unambiguously

25  prohibits their claims from advancing.  Nor can Plaintiffs allege sufficient facts to

26  support suit against Governor Newsom.  Accordingly, Parent Plaintiffs are granted

27  leave to submit a Second Amended Complaint within 21 days.  LEA Plaintiffs are

28  denied leave to amend, and their claims are dismissed with prejudice, as are the

15

claims against Governor Newsom.

**CONCLUSION**

In accordance with the above, IT IS HEREBY ORDERED that Defendant's Motion to Dismiss (ECF No. 22) is GRANTED. Parent Plaintiffs' claims are DISMISSED WITHOUT PREJUDICE and Parent Plaintiffs may file a Second Amended Complaint within 21 days; LEA Plaintiffs' claims, and all claims against Governor Newsom, are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

Dated:  **April 17, 2025**

Hon. Daniel J. Calabretta
UNITED STATES DISTRICT JUDGE

DJC5 – Chino24cv01941.MTD